FACTORS ETC., INC. and Boxcar
Enterprises, Inc., Plaintiffs,

v.

PRO ARTS, INC. and Stop and Shop
Companies, Inc., Defendants.

No. 77 Civ. 4704 (CHT).

United States District Court,
S. D. New York.

July 29, 1980.

Golenbock & Barell, New York City and Ervin, Cohen & Jessup, Beverly Hills, Cal., for plaintiffs; Michael C. Silberberg, Donald F. Schneider, New York City, Arthur Fields, Daniel Lidman, Beverly Hills, Cal., of counsel.

Schulman, Berlin & Davis, New York City, for defendants; William J. Davis, Charlotte A. W. Pfahl, New York City, of counsel.

OPINION

TENNEY, District Judge.

This action involves the defendants' Pro Arts, Inc. ("Pro Arts") and Stop and Shop Companies, Inc. ("Stop and Shop") alleged infringement of the plaintiffs' Factors Etc., Inc. ("Factors") and Boxcar Enterprises, Inc. ("Boxcar") exclusive right to exploit commercially the name and likeness of Elvis Presley. The factual and legal background of this suit has been extensively described in this Court's prior opinion granting plaintiffs' motion for a preliminary injunction, 444 F.Supp. 288 (S.D.N.Y.1977), and the Second Circuit's decision affirming that opinion and order, 579 F.2d 215 (2d Cir. 1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979), and will not be repeated in full here. Relying on these previous decisions, and other documentary evidence submitted to the Court, the plaintiffs have moved for summary judgment seeking a permanent injunction prohibiting the defendants from marketing Presley memorabilia and an order directing that further proceedings be held to determine damages. The defendants oppose this motion and have cross–moved for an order vacating the preliminary injunction. Upon reviewing the various arguments made by the parties, both orally and in their briefs, the Court concludes that the plaintiffs' motion should be granted. The matter is therefore referred to Magistrate Naomi R. Buchwald for a determination of damages.

*Background*

On August 18, 1977, two days after Elvis Presley's death, Factors purchased from Boxcar the exclusive license to exploit and merchandise the name and likeness of the well–known entertainer. The following day, Pro Arts published a poster entitled "IN MEMORY" that bore a photograph of Presley and the dates "1935–1977." The photograph had been taken by a staff photographer of the Atlanta Journal and published in the newspaper the day after Presley died. Pro Arts purchased the photograph and immediately applied for a copyright for the poster. Stop and Shop was one of Pro Arts' first customers and sold the poster through its New York stores.

After a series of complaints and legal maneuvers, the plaintiffs sought a preliminary injunction against the defendants to restrain the sale of the poster. In a companion action raising similar legal issues, *Factors Etc., Inc. v. Creative Card Co.,* 444 F.Supp. 279, 282 (S.D.N.Y.1977), this Court examined the legal underpinnings of the right claimed by the plaintiffs and concluded that "a recognized property right, the 'right of publicity,' inhered in and was exercised by Elvis Presley in his lifetime, that it was assignable by him and was so assigned, that it survived his death and was capable of further assignment." Because the plaintiffs had made a clear showing of probable success on the merits and possible irreparable injury resulting from the defendants' actions, *see Sonesta Int'l Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973), the defendants were enjoined from (1) manufacturing, selling or distributing any more copies of the "IN MEMORY" poster; (2) marketing any other posters, reproductions or copies containing any likeness of Elvis Presley; and (3) utilizing for commercial profit in any manner or form Presley's name or likeness.

The defendants appealed this order to the Second Circuit. As stated by the circuit court:

On appeal, Pro Arts alleges two errors of law on the part of the trial court. According to Pro Arts, the trial court erred first in concluding that the right of publicity could survive the death of the celebrity. Second, Pro Arts argues that even if the right did so survive, Pro Arts was privileged, as a matter of law, in printing and distributing its "memorial poster" of Presley, because the poster celebrated a newsworthy event.

579 F.2d at 219.

The court of appeals rejected both arguments. First after discussing other cases involving the "right of publicity," and noting the "dearth of New York case law in this area," the court stated that:

The State of New York provides a statutory right for the protection of a *living*

person from commercial exploitation of his name and picture by others without his written consent. This statutory right, also called a "right of privacy," is predicated upon the classic right of privacy's theoretical basis which is to prevent injury to feelings. *Price v. Hal Roach Studios, Inc.*, 400 F.Supp. 836, 843 (S.D.N.Y. 1975); *Lombardo v. Doyle, Dane & Bernbach*, 58 A.D.2d 620, 396 N.Y.S.2d 661 (1977). In *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir.), *cert. denied*, 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953), we recognized that the right of publicity exists independent from the statutory right of privacy and that it can be validly transferred by its owner . . . .

There can be no doubt that Elvis Presley assigned to Boxcar a valid property right, the exclusive authority to print, publish and distribute his name and likeness. In so doing, he carved out a separate intangible property right for himself, the right to a certain percentage of the royalties which would be realized by Boxcar upon exploitation of Presley's likeness and name. The identification of this exclusive right belonging to Boxcar as a transferable property right compels the conclusion that the right survives Presley's death. The death of Presley, who was merely the beneficiary of an income interest in Boxcar's exclusive right, should not in itself extinguish Boxcar's property right. Instead, the income interest, continually produced from Boxcar's exclusive right of commercial exploitation, should inure to Presley's estate at death like any other intangible property right. To hold that the right did not survive Presley's death, would be to grant competitors of Factors, such as Pro Arts, a windfall in the form of profits from the use of Presley's name and likeness. At the same time, the exclusive right purchased by Factors and the financial benefits accruing to the celebrity's heirs would be rendered virtually worthless.

579 F.2d at 220–21 (original emphasis and footnote omitted). Secondly, the court of appeals held that Pro Arts' poster was not privileged under the First Amendment as celebrating a newsworthy event. *Id.* at 222.

*Summary Judgment*

■ Although the plaintiffs prevailed on their initial motion for a preliminary injunction, the Second Circuit's affirmance of this Court's order does not constitute a final adjudication on the merits of their claim. *See Diversified Mortgage Investors v. U. S. Life Title Ins. Co.*, 544 F.2d 571, 576 (2d Cir. 1976). A decision granting a preliminary injunction does not conclusively determine all factual issues or legal questions raised in the litigation. *Male v. Crossroads Assoc.*, 337 F.Supp. 1190, 1194 (S.D.N.Y.1971), *aff'd*, 469 F.2d 616 (2d Cir. 1972). Accordingly, in moving for summary judgment, these plaintiffs must demonstrate that there is no "genuine issue for trial." Fed.R. Civ.P. 56(e). When a motion for summary judgment is supported by the requisite documents, the opposing party must set forth "concrete particulars" and cannot rest upon "conclusory allegations or denials." *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978). "[E]ven in suits for injunctive relief, the district courts should not hesitate to grant a plaintiff's request for summary judgment when the defendant has failed to meet the requirements prescribed by Rule 56(e)." *Id.* at 34.

In opposing the plaintiffs' motion for summary judgment, the defendants rely on the Sixth Circuit's recent opinion in *Memphis ᐟ Development Foundation v. Factors Etc., Inc.*, 616 F.2d 956 (6th Cir. 1980) (panel decision, rehearing en banc denied) (hereinafter *Memphis Development*), and on what they describe as "three affirmative defenses which have yet to be conclusively litigated in this matter." Defendants' Memorandum in Opposition to Motion for Summary Judgment ("Defendants' Memorandum") at 3. Each of these issues will be discussed in turn. The Court concludes that its initial legal rulings should remain undisturbed and that no genuine factual issues have been raised.

### The Memphis Development Case

Reversing a decision by the District Court for the Western District of Tennessee, 441 F.Supp. 1323 (W.D.Tenn.1977), the Sixth Circuit held that the exclusive right to publicity does not survive a celebrity's death; the right is not inheritable and after death the opportunity for gain shifts to the public domain. The action arose from the Memphis Development Foundation's plan to erect a large bronze statue of Elvis Presley in downtown Memphis. The Foundation solicited public contributions to pay for the sculpture, and donors who gave $25.00 or more received an eight–inch pewter replica of the statue. Factors challenged this action on the grounds that the Foundation was selling the statues and thus infringing Factor's exclusive right to reap commercial value from Presley's name and likeness. As stated by the Sixth Circuit, it was "called upon in this diversity case to determine whether, under *Tennessee law*, the exclusive right to publicity survives a celebrity's death." 616 F.2d at 957 (emphasis added). The court noted, however, that Tennessee courts had not addressed the issue and it had no way to discern their "predisposition." Accordingly, the court attempted to resolve the issue in light of "practical and policy considerations, the treatment of other similar rights in our legal system, the relative weight of the conflicting interests of the parties, and certain moral presuppositions concerning death, privacy, inheritability and economic opportunity." *Id.* at 958. The Sixth Circuit's treatment of the Second Circuit's opinion in the instant action, and other cases cited therein, consisted of a footnote acknowledging that a few recent cases have characterized the right of publicity as property that could be passed on to heirs or assigns.[1]

The defendants argue that this Court should now reverse its initial view of the law, affirmed by the Second Circuit, and adopt the position espoused by the Sixth Circuit. According to the defendants, the two cases on which the Second Circuit primarily relied in affirming this Court's order–the district court opinion in *Memphis Development* and *Price v. Hal Roach Studios, Inc.*, 400 F.Supp. 836 (S.D.N.Y.1975)– "are no longer entitled to be given any weight" in determining the summary judgment motion. *Price* involved a dispute over the ownership of the commercial right to use the names and likenesses of Stanley Laurel and Oliver Hardy following the deaths of the famous comedians. While the plaintiffs did not dispute the defendants' right to distribute copyrighted Laurel and Hardy movies or single frames, they did claim an exclusive right for other commercial purposes. The district court held that the deaths of the actors did not extinguish the right of publicity assigned to the grantee. The defendants contend that *Price* is not only distinguishable from the instant action because the copyrighted materials were not challenged, but that its authority is further undermined because the *Price* court relied on the lower court opinion in *Lugosi v. Universal Pictures Co.*, which was recently reversed by the California Supreme Court, 25 Cal.3d 813, 603 P.2d 425, 160 Cal.Rptr. 323 (1979). The defendants thus assert that "this Court is virtually the only Court in this country which has recognized survival of the 'right to publicity' after death of the celebrity." Defendants' Memorandum at 5.

The defendants' sweeping assertion regarding the state of the law across the United States is both unfounded and unpersuasive. Indeed, the Second Circuit's opinion in this action specifically referred to decisions rendered by other courts that supported its decision. *See, e. g., Lombardo v. Doyle, Dane & Bernbach*, 58 A.D.2d 620, 396 N.Y.S.2d 661 (2d Dep't 1977). Nor did the *Price* court rely solely on the decision of the California appellate court, and the *Lugosi* decision is distinguishable, in part, from the case at bar. Even if this Court's decision is

---

1. The district court decision in *Memphis Development* had previously been affirmed, without an opinion, by the Sixth Circuit. 578 F.2d 1381 (6th Cir. 1978). This prior affirmance is not addressed in the subsequent panel opinion. A request for a rehearing or a rehearing en banc was denied about seven weeks after the panel decision was issued. *See* 616 F.2d at 956.

contrary to the conclusions reached by the Sixth Circuit and the California Supreme Court, *see Guglielmi v. Spelling–Goldberg Productions,* 25 Cal.3d 860, 603 P.2d 454, 160 Cal.Rptr. 352 (1979), it conforms to the view firmly stated by the Second Circuit and rests upon a careful consideration of relevant cases and competing policy concerns. *See generally* Felcher & Rubin, The Descendibility of the Right of Publicity: Is There Commercial Life After Death?, 89 Yale L.J. 1125, 1129–32 (1980); Felcher & Rubin, Privacy, Publicity, and the Portrayal of Real People by the Media, 88 Yale L.J. 1577, 1618–22 (1979); Note, The Right of Publicity–Protection for Public Figures and Celebrities, 42 Brooklyn L.Rev. 527, 541–49 (1976); Comment, Transfer of the Right of Publicity: Dracula's Progeny and Privacy's Stepchild, 22 U.C.L.A.L.Rev. 1103 (1975). The Court therefore adheres to its initial determination that, in the word of the Second Circuit, "Factors possesses the exclusive right to print and distribute Elvis Presley memorabilia, a right which was validly transferred to it from Boxcar following Presley's death." 579 F.2d at 222.

### The Copyright Claim

The defendants claim that the plaintiffs' "right of publicity" is contrary to and preempted by the federal copyright laws enacted pursuant to Article I, Section 8, of the Constitution. As set out in their brief, defendants' copyright claim rests on three not entirely consistent propositions. First, defendants allege that the photograph of Presley portrayed in the poster was placed in the public domain by newspaper publication and could therefore be copied and sold by anyone. Second, defendants contend that they have a valid copyright in the "IN MEMORY . . . 1935–1977" Poster. Finally, they argue that "[t]he copyright of the poster, like the public domain status of the photograph, preempt [sic] any conflicting state law rights of the plaintiffs." Defendants' Memorandum at 21.

The plaintiffs, in turn, respond that the defendants are foreclosed from relitigating their copyright claim because it was reject-ed *"sub silentio"* by the Second Circuit decision on the preliminary injunction. The plaintiffs cite the defendants' appellate reply brief, which stated that the "principal issue on appeal is whether the Court below erred when it enjoined defendants from printing the likeness of a deceased entertainer in a poster print in which the defendants own the copyright." However, the Second Circuit did not directly address the copyright question. The portion of the court of appeals opinion quoted above reveals that the court focused on two main issues raised by the defendants: whether the right of publicity could survive death and whether Pro Arts had a First Amendment privilege to distribute the poster. *See* 579 F.2d at 219. While the Second Circuit was undoubtedly aware of the defendants' copyright claim, *see id.* at 217, this Court cannot view the court of appeals decision as conclusively resolving that question. Furthermore, as noted above, a judgment on a preliminary injunction motion does not constitute a final adjudication of all the issues raised in the case.

The plaintiffs also contend that the defendants have not presented any facts demonstrating that Pro Arts possesses a valid copyright in the Presley poster or photograph. The Court agrees that the evidence submitted by the defendants *in response to this summary judgment motion* is sorely deficient. Neither the defendants' Rule 9(g) Statement, nor the affidavits and briefs received in opposition to this motion, offers any concrete proof regarding the copyright. Furthermore, the defendants' alternative argument that the photograph could have been copied and sold by anyone because it was in the public domain and thus not "copyrightable," Defendants' Memorandum at 16–19, implies that Pro Arts does not or could not obtain a copyright. The Court does, however, recognize defendant Pro Arts' claim to a copyright on the basis of documents previously submitted to this Court on a 1977 motion to dismiss the plaintiffs' preliminary injunction suit or transfer it to the Northern District of Ohio. In arguing for transfer, the defendants cited an action pending in Ohio in which Pro

Arts had sued Factors on a variety of claims. The complaint in that action was attached to the defendants' motion papers. Exhibit 9 to that complaint, also referred to as the moving defendants' Exhibit 2, is a Certificate of Registration of a Claim to Copyright, Registration Number K125341, for a work entitled "IN MEMORY." The date of publication given is August 19, 1977, and the application was received by the Copyright Office on August 30, 1977. This document is sufficient to establish Pro Arts' possession of a copyright in the poster.

Section 209 of the Copyright Act of 1909 ("1909 Act"), 17 U.S.C. §§ 1 et seq., revised, Act of October 19, 1976, Pub.L. 94–553, 90 Stat. 2598, codified at 17 U.S.C. §§ 101 et seq., which governs this pre–1978 publication and distribution, see 17 U.S.C. § 301(a), (b)(2), provided that a registration certificate created a prima facie presumption as to all the facts stated therein. In construing this provision, many courts anticipated the principle expressly incorporated in section 410(c) of the Copyright Act of 1976 ("1976 Act"), 17 U.S.C. §§ 101 et seq., and ruled that the certificate was prima facie evidence not just of the facts stated but of the validity of the copyright itself. See Nimmer on Copyright ("Nimmer") § 12.-11[B] at 12–71 & n.21 (1978) and cases cited therein. Other courts, however, held that because the certificate did not include facts regarding the type of copyright notice provided on the published work, it could not constitute prima facie evidence that the copyright claimant had fully complied with the statutory notice requirements. See id. at 12–72 & n.22 and cases cited therein. In this case, the work at issue speaks for itself, for the "IN MEMORY" poster bore the Pro Arts name and the date. See Exhibit B to Affidavit of Walter Rohner in Support of Motion for Preliminary Injunction, sworn to September 23, 1977. These additions satisfied the notice requirements of the Copyright Act. See Nimmer § 7.09[A] at 7–43. The plaintiffs have not challenged the copyright on the traditional grounds that the work was in the public domain or lacked sufficient originality. See generally Nimmer § 2.01 at 2–5, § 2.03[G] at 2–37,

§ 2.08[E] at 2–109. Nor do they contest Pro Arts' assertion that it purchased the copyright to the photograph from Skinner.

The defendants' public domain argument, which is patently inconsistent with their copyright claim, rests on their assertions that the Presley photograph was placed in the public domain when it was published in the Atlanta Journal and that "[w]hen federal law would deny a copyright, states may not restrict the article's sale." Defendants' Memorandum at 17. The Court need not, however, decide whether general publication of the photograph entitled the defendants, or anyone else, to market a blown–up color copy incorporated in a poster with an original title and dates. Essentially, the public domain defense raises the same issue that the Court must now address having concluded that Pro Arts secured a copyright to the Presley poster: whether federal copyright law preempts the plaintiffs' common law right of publicity. The Court now turns to that inquiry.

The defendants' preemption argument relies in part on section 301 of the 1976 Act which provides:

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright . . . are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law of statutes of any State.

As the plaintiffs point out, however, this provision is not directly applicable to the instant action. Subsection (b)(2) of this provision specifically states that nothing in the Act "annuls or limits any rights or remedies under the common law or statutes of any State with respect to . . . any cause of action arising from undertakings commenced before January 1, 1978." This action clearly preceded the effective date of section 301. The suit was commenced in September 1977 and arose from events that occurred the previous month. Accordingly, Factors' right to publicity could not be preempted pursuant to section 301, even if this

right were deemed to be "equivalent to any of the exclusive rights within the general scope of copyright."

The defendants concede that section 301 may not expressly apply to this action but contend that the provision clearly indicates Congress's intent to "occupy the field" in which the plaintiffs' claimed right falls. Transcript of June 19, 1980 Hearing ("Tr.") at 25. The Court disagrees. Subsection (b)(3) provides that the Act does not limit or annul state rights or remedies with respect to "activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106." The original draft of this provision delineated several examples of rights that were specifically not equivalent to the general scope of copyright: "breaches of contract, breaches of trust, *invasion of privacy*, defamation, and deceptive trade practices such as passing off and false representation." H.R. 4347, 89th Cong., 2d Sess. (1966) (emphasis added). Congress's intent to preserve the common law right of publicity, a branch of the right to privacy, is expressly stated in the House Report.

The examples in clause (3), while not exhaustive, are intended to illustrate rights and remedies that are different in nature from the rights comprised in a copyright and that may continue to be protected under State common law or statute. The evolving common law rights of "privacy," "*publicity*," and trade secrets, and the general laws of defamation and fraud, would remain unaffected as long as the causes of action contain elements such as an invasion of personal rights or a breach of trust or confidentiality, that are different in kind from copyright infringement. Nothing in the bill derogates from the rights of parties to contract with each other and to sue for breaches of contract; however, to the extent that the unfair competition concept known as "interference with contract relations" is merely the equivalent of copyright protection, it would be preempted.

H.R.Rep.No.94–1476, 94th Cong., 2d Sess., at 132 reprinted in [1976] U.S.Code Cong. & Admin.News, pp. 5659, 5748 (hereinafter "House Report") (emphasis added); *see* Nimmer § 1.01[B] at 1–12, 1–13 & n.49. Prior to final action by the House of Representatives, three additional examples of rights not equivalent to copyright privileges were added to the original bill: misappropriation, trespass, and conversion. S. 22, 94th Cong., 2d Sess. (1976). subsequently, all the examples listed in subsection 301(b)(3) were deleted. This deletion constituted a rather hasty response to concerns expressed by the Justice Department over the inclusion of the common law right against misappropriation. *See* Nimmer § 1.01[B] at 1–13, 1–14. The House debate on the issue, which is somewhat confusing, indicates that the legislators were concerned primarily with the potential problems raised by the addition of misappropriation. *See* 122 Cong.Rec.H10910 (Sept. 22, 1976). Accordingly, commentators in this area have agreed that the original examples of common law rights now equivalent to copyright, including the right to privacy, should be regarded as non–preempted rights. *See, e. g.,* Nimmer § 1.01[B] at 1–13; Goldstein, Prempted State Doctrines, Involuntary Transfers and Compulsory Licenses: Testing the Limits of Copyright, 24 U.C.L.A.L.Rev. 1107, 1117–18 (1977); Gorman, An Overview of the Copyright Act of 1976, 126 U.Pa.L.Rev. 856, 866–67 (1978). Furthermore, while the majority opinion of the California Supreme Court in *Lugosi v. Universal Pictures Co., supra,* did not address the preemption issue, Chief Justice Bird's dissent indicated that congressional action had not preempted the recognition of the common law right of publicity. 25 Cal.3d at 847–848, 603 P.2d at 446–47, 160 Cal.Rptr. at 344–45. The Court agrees with this view and concludes that the 1976 Act was not intended to preempt the right of publicity recognized in this action.

The relationship between state laws and the federal patent and copyright laws was examined in several Supreme Court decisions that preceded enactment of the 1976 Act. In *Sears, Roebuck & Co. v. Stiffel Co.,*

376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and *Compco Corp. v. Day–Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), the Court held that a state's unfair competition law cannot prohibit the copying of an article that is not entitled to protection under federal patent law. Because the unfair competition laws gave "protection of a kind that clashes with the objectives of the federal patent laws," they could not survive a challenge on preemption grounds. 376 U.S. at 231, 84 S.Ct. at 789. According to the Court, "[t]o allow a State by use of its law of unfair competition to prevent the copying of an article which represents too slight an advance to be patented would be to permit the State to block off from the public something which federal law has said belongs to the public." *Id.* at 231–32, 84 S.Ct. at 789.

Two subsequent Supreme Court cases refined and elucidated the approach adopted in *Sears* and *Compco*. Federal patent law was held not to preempt a state's trade secret law in *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974). The Court examined the objectives of both the patent and trade secret laws and concluded that the two were not inconsistent. While the trade secret law protected items that would not be considered patentable (*i. e.*, discoveries or customers lists), the Court held that Congress had "left the area unattended" with respect to such nonpatentable subject matter. *Id.* at 483, 94 S.Ct. at 1887, *quoting Goldstein v. California*, 412 U.S. 546, 570, 93 S.Ct. 2303, 2316, 37 L.Ed.2d 163 (1973). The existence of another "form of incentive to invention" was deemed not to disturb the patent policy of encouraging the creation of new products and processes. 416 U.S. at 484, 94 S.Ct. at 1887. Additionally, the Court stated that the "patent policy of disclosure" did not conflict with the extension of trade secret protection to clearly patentable inventions. *Id.* at 491, 94 S.Ct. at 1890. The Court thus concluded that "[u]ntil Congress takes affirmative action to the contrary, States should be free to grant protection to trade secrets." *Id.* at 493, 94 S.Ct. at 1892.

This same approach was employed by the Court in *Goldstein v. California, supra*, which rejected a preemption challenge to a state criminal statute that prohibited the unauthorized duplication of musical recordings. In resolving the issue, the Court first concluded that the Constitution does not preclude states from granting copyrights and does not vest such authority exclusively in the federal government. 412 U.S. at 560, 93 S.Ct. at 2311. In determining whether this particular statute was void under the Supremacy Clause, the Court sought to ascertain whether the law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 561, 93 S.Ct. at 2312, *quoting Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). Upon examining the status of musical recordings under the 1909 Act and predecessor statutes, the Court concluded that Congress did not intend recordings "as renderings of original artistic performance, to be free from state control." 412 U.S. at 566, 93 S.Ct. at 2314. Congress had not "so occupied the field of copyright protection as to pre-empt all comparable state action." *Id.* at 567, 93 S.Ct. at 2315. Reaffirming its holdings in *Sears* and *Compco*, the Court stated:

In regard to mechanical configurations, Congress had balanced the need to encourage innovation and originality of invention against the need to insure competition in the sale of identical or substantially identical products. The standards established for granting federal patent protection to machines thus indicated not only which articles in this particular category Congress wished to protect, but which configurations it wished to remain free. The application of state law in these cases to prevent the copying of articles which did not meet the requirements for federal protection disturbed the careful balance which Congress had drawn and thereby necessarily gave way under the Supremacy Clause of the Constitution. No comparable conflict between state law and federal law arises in

the case of recordings of musical performances. In regard to this category of "Writings," Congress has drawn no balance; rather, it has left the area unattended, and no reason exists why the State should not be free to act.

*Id.* at 569–70, 93 S.Ct. at 2316 (footnote omitted).

The Court directly addressed the question whether the exercise of the power to grant copyrights by some states will prejudice the interests of other states. In the Court's view, a state-created copyright is effective only within the borders of that state. Therefore, if one state grants such protection, the interests of other states are not prejudiced because their citizens are free to copy within their borders what may be protected elsewhere. The Court recognized that the interests of a state that grants copyright protection may be adversely affected by other states that do not, because an individual could go to another state to buy unauthorized copies of a work protected in his home state. Yet this conflict was considered neither so inevitable nor so severe as to demand exclusive federal control of copyright privileges. Similarly, the Court determined that the concurrent exercise of the authority to grant copyright–like protection would not necessarily create conflict. As stated by the Court, "where Congress determines that neither federal protection nor freedom from restraint is required by the national interest, it is at liberty to stay its hand entirely." *Id.* at 559, 93 S.Ct. at 2311.

Adopting the analysis employed in *Kewanee* and *Goldstein*, this Court has sought to determine whether Congress has taken "affirmative action contrary" to the common law right of publicity or decided that "federal protection or freedom from restraint is required by the national interest." The preceding discussion of Congress's intent in enacting the 1976 Act indicates that just the opposite is true—Congress fully intended to preserve state law protecting the right of publicity. While the 1976 Act does not directly govern the instant action, *see* 17 U.S.C. § 301(b)(2), it does evidence con-

gressional intent not to preempt this state law right.

Professor Nimmer, an eminent expert on copyright law, has observed that the scope of preemption under section 301 of the 1976 Act is comparable to that under the 1909 Act as interpreted by *Goldstein.* Nimmer § 1.01[B] at 1–7 n.22. In his view, "it seems likely that Section 301 merely codified *Goldstein,*" with respect to works published before January 1, 1978, the effective date of the 1976 Act. *Id.* Under this interpretation, the 1976 Act's preemption provision could be applied to pre–1978 publications that allegedly violate a state law right. Section 301 provides that the federal copyright law preempts "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 . . . ." However, determining whether a state right is "equivalent" to copyright is not always an easy chore. According to Professor Nimmer, if the act of reproduction, performance, distribution or display will in itself infringe the state–created right, then such right is preempted. *Id.* at 1–11. If other elements are required to constitute a state–created cause of action, then the right is not within the "general scope of copyright" and is not preempted. *Id.* As described above, the original draft of section 301 included examples of non–preempted state law rights, such as breach of contract, breach of trust, invasion of privacy, and defamation. Professor Nimmer has noted that in each example elements other than, or in addition to, the acts of reproduction, performance, distribution, or display are necessary to establish a state cause of action for an infringement of the right. *Id.* at 1–12. Stating that Congress considered the right of publicity "to be immune from preemption," Professor Nimmer asserts that "[i]nvasion of privacy and defamation may sometimes occur by acts of reproduction, distribution, performance or display, but the essence of those torts does not lie in such acts." *Id.* at 1–13 & n.49.

While the descendible right of publicity recognized in this action may be

infringed by reproduction, distribution, or display, a cause of action for infringement cannot be asserted unless the assignee of the right demonstrates that the "celebrity" commercially exploited his name and likeness during his lifetime. *See Factors Etc., Inc. v. Pro Arts, Inc., supra,* 579 F.2d at 221–22; *Factors Etc., Inc. v. Creative Card Co., supra,* 444 F.Supp. at 283–84. In contrast to a copyright suit, the product at issue is a "persona" that has already been profitably marketed. *See Factors Etc., Inc. v. Creative Card Co., supra,* 444 F.Supp. at 283. As stated by the Second Circuit, the exploitation of a celebrity's name and image during his lifetime creates a "separate intangible property right." *Factors Etc., Inc. v. Pro Arts, Inc., supra,* 579 F.2d at 221. This right is not "equivalent" to a copyright, and in action for its infringement requires elements distinct from a copyright violation suit.

In *Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), the Supreme Court recognized that the right of publicity was consistent and could co–exist with federal copyright law. The defendant in *Zacchini* had broadcast the plaintiff's entire fifteen–second human cannonball act and claimed the First Amendment privilege to report newsworthy events when sued for violating the plaintiff's right of publicity. The Ohio Supreme Court upheld the First Amendment claim, relying on *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), which rejected a right of privacy challenge against a magazine that had reported on a matter within the "public interest." The Supreme Court reversed, noting that *Time, Inc. v. Hill* "involved an entirely different tort from the 'right of publicity.'" 433 U.S. at 571, 97 S.Ct. at 2855. The Court observed that the state's interest in recognizing a right of publicity lay in protecting the performer's proprietary interest in his act and in encouraging such entertainment. This interest was described as "closely analogous to the goals of patent and copyright law." *Id.* at 573, 97 S.Ct. at 2856. Reiterating this point, the Court later asserted that the state law right of publicity "pro-vides an economic incentive for [the performer] to make the investment required to produce a performance of interest to the public." *Id.* at 576, 97 S.Ct. at 2858. This same consideration, said the Court, underlies the federal patent and copyright laws. Citing *Goldstein* and *Kewanee,* the Court thus concluded that "[t]he Constitution does not prevent Ohio from making a similar choice here in deciding to protect the entertainer's incentive in order to encourage the production of this type of work." *Id.* at 577 & n.18, 97 S.Ct. at 2858 & n.18.

■ In light of the Congressional intent reflected in the legislative history of the 1976 Act, Supreme Court decisions discussing the interplay between state–created rights and federal copyright or patent law and the distinctions between the right of publicity and copyright, this Court concludes that the plaintiffs' right of publicity is neither contrary to nor preempted by federal law. This right covers an "area unattended" by federal law and is not equivalent to the general scope of copyright law. The plaintiffs' prior right to exploit the Presley name and image cannot be defeated by the defendants' attempt to copyright individual items. Nor is the defendants' allegation that the photograph was in the public domain an adequate defense to the plaintiffs' infringement action. The right of exploitation had *previously been established and exercised* and could not be thwarted by the use of a published photograph. The right of publicity, firmly supported by the Supreme Court and the Second Circuit, would be severely undermined if it could be so easily circumvented by using a photograph or representation allegedly copyrighted or within the public domain.

## The "Right of First Refusal" Claim

The defendants' second so–called affirmative defense is that the publication and sale of the Presley poster was authorized by a contractual right of first refusal that Factors had granted Pro Arts with respect to all posters that Factors had the exclusive right to distribute. While the Court rejects

the plaintiffs' assertion that this defense has been waived, it finds the defendants' claim meritless.

In March 1977, Pro Arts and Factors entered into an agreement concerning the production and sale of posters and "iron–on transfers" depicting various celebrities. Exhibit H to Deposition of Michael P. Trikilis, taken on March 3, 1978 ("M. Trikilis Dep."). The first paragraph states that "Pro Arts grants to Factors the exclusive distributorship of iron–on transfers depicting . . . Farrah Fawcett, including the use of her name thereon, and the use of the copyright therefor, for a period of one year . . . ." The second paragraph delineates the terms under which Pro Arts has the exclusive right to sell iron–on transfers made by Factors. Paragraph six grants Factors the right to sell posters with Pro Arts copyright, including but not limited to the Farrah Fawcett poster. Other paragraphs described terms regarding payment, royalties, records, and shipment of orders. The final paragraph in the agreement, number thirteen, states:

> Pro Arts also grants to Factors the first refusal to the exclusive distributorship for any other actors for whom *Factors* has the right to produce posters and iron–on transfers.

(Emphasis added).

The plaintiffs contend that the emphasized term is a typographical error and should read "Pro Arts." The parties intended Factors to have a right of first refusal to Pro Arts' property and did not intend to create reciprocal rights. As written, the paragraph is inherently confusing because Pro Arts could not grant Factors the right of first refusal to distribute posters and transfers that Factors already had the right to produce.

The defendants agree that the provision is ambiguous but the agreement ends there. In the defendants' view, the ambiguity should be resolved by reversing the placement of the names "Pro Arts" and "Factors" in the first line. They point out that the agreement was drafted by Factors' counsel and that it included other errors on the face of the document. The defendants contend that the contract, as well as past practice and understandings between the parties, establishes that Pro Arts had a "right of first refusal for exclusive rights to distribute all posters and iron–ons that Factors had a right to distribute." Affidavit of Theodore N. Trikilis, sworn to March 5, 1980 ("Trikilis Aff.") at 7.

Paragraph thirteen was destined to create trouble between the parties because it was poorly drafted and is confusing on its face. The plain language of the provision does not grant Pro Arts any rights regarding property acquired by Factors. In his deposition testimony in an Ohio action between these parties, Harry Geissler, who signed the agreement on behalf of Factors, stated that paragraph thirteen contained a typographical error and that Pro Arts was aware of the mistake. According to Geissler, "I had no reason in the world to give [Pro Arts] the rights to anything because I had nothing, and we had no intentions, at that time, of going to buy things because we had everything we could do to control what we did." Deposition of Harry L. Geissler, taken on May 8, 1979 ("Geissler Dep.") at 97. While Geissler stated that Factors subsequently offered Pro Arts the rights to produce posters it had acquired, *id.* at 99, he did not characterize this arrangement as a contractual right of first refusal.

The deposition testimony of Pro Arts' vice-president Theodore N. Trikilis, also taken in the Ohio action, presents quite a different view. Trikilis maintained that the contract provided Pro Arts with a right of first refusal for properties acquired by Factors. Deposition of Theodore N. Trikilis, taken on June 26 & 27, 1979 ("Trikilis Dep.") at 175, 219–22, 231–34. After a fairly extensive discussion of the infamous paragraph thirteen, the following colloquy ensued:

> Q. Prior to Pro Arts manufacturing, marketing and selling its Elvis Presley poster, did Pro Arts or you or anyone at Pro Arts contact anyone at Factors with respect to Elvis Presley?

A. I think that we had already secured the rights, prior to Factors having any alleged rights in their Elvis Presley license, to a photograph from the front page of the Atlanta Journal under which the copyright was owned by the photographer.

Q. Bud Skinner?

A. Bud Skinner. And we purchased those rights directly from Bud Skinner, all rights to the copyright and to the right to produce the photo as a photojournalistic approach to the—announcing the news of Presley's death.

Q. All right. Did—

A. Now wait a minute. Factors had not had a contract with Presley dated prior to our buying the copyright and buying the photo from Bud Skinner.

Q. I am not making an argument. I am simply asking a question.

A. So, no, we did not, because Factors did not have those rights to give us.

Q. All right. So you did not contact Factors with respect to the Elvis Presley poster prior to your coming out on the market with it, correct?

A. There was no need to.

Q. But you did not, correct?

A. Well, no, because they did not have the rights.

Q. And in fact the first contact you had with Factors with respect to your Elvis Presley poster was a cease and desist letter received by Factors on the Elvis Presley poster, correct?

A. I would assume that was either a letter or telegram.

Q. A telegram; okay.

A. I'm just saying I don't know the exact date on it.

Q. Okay. You did not negotiate with Factors with respect to your Elvis Presely poster, in terms of a license or anything to that effect, did you?

A. On Elvis Presley we did not feel that a license was necessary.

Q. And that of course is still your position?

A. That is definitely our position. It was an infringement of our freedom of speech.

Q. In other words, one of your contentions in the other lawsuit [referring to this action] would be that you would have the right to produce, market and sell your Elvis Presley poster without any reference to Factors or any license from or relationship with Factors, correct?

A. Correct, and—yes, I would say that's very correct.

Q. And in fact Pro Arts is at present challenging Factors' right to the exclusive production, manufacture and distribution of items and merchandise with Elvis Presley's name and image on it, correct?

A. That's not correct. We are challenging Factors' right to restrain a newsworthy photograph of Elvis Presley utilized by the Atlanta Journal on the day of Presley's death that was later taken and disseminated to the rest of the United States. That photograph was a copyright owned and purchased by Pro Arts fully and totally. And that that photograph as a copyright remained part of our corporate copyright, and that that photograph belonged to Pro Arts entirely, and that we had the rights under freedom of speech and under freedom of the press to distribute that poster under the Constitution of the United States.

*Id.* at 239–42.

■■ The Court agrees with the defendants' assertion that the testimony quoted above does not constitute a waiver of a defense based on an alleged first right of refusal. However, Trikilis's statements do indicate that Pro Arts did not rely on any purported contractual rights when it published and distributed the Presley poster. Indeed, Factors did not acquire the right to commercially exploit the Presley name and likeness until August 18, 1977, which was just one day before Pro Arts first published the "IN MEMORY" poster. It appears, therefore, that Pro Arts did not even know about the rights acquired by Factors at the time that Pro Arts commenced publication.

On August 24, 1977, Pro Arts notified Boxcar, not Factors, that it intended to distribute the poster. Exhibit E to M. Trikilis Dep. (Letter from Raymond Scott, attorney for Pro Arts, to Mr. C. Beverly Briley, Boxcar's counsel). Even if paragraph thirteen of the Pro Arts/Factors Agreement could be construed as creating a reciprocal right of refusal–a construction the Court does not favor–it is clear that no such right was exercised regarding the Presley poster.

Trikilis has submitted an affidavit to the Court that attempts to explain and elaborate upon his above–quoted deposition testimony in the Ohio action. He contends that the conflicts between his present assertions and the plaintiffs' allegations create genuine factual issues precluding summary judgment. The Court disagrees. Triable issues of fact cannot be conjured up merely by submitting an affidavit that attempts to retract or modify prior sworn testimony. *See SEC v. Research Automation Corp., supra*, 585 F.2d at 34; *Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969); *Price v. Worldvision Enterprises, Inc.*, 455 F.Supp. 252, 264–66 (S.D.N.Y.), *aff'd*, 603 F.2d 214 (2d Cir. 1979). Furthermore, Trikilis's contention that he and Pro Arts consistently maintained that reciprocal rights of first refusal were established by the contract does not affect the Court's conclusion that no such right, if it existed, was exercised or relied upon in this case. No evidence has been submitted demonstrating Pro Arts' invocation of its alleged contractual right. The conduct of the parties and the sequence of events giving rise to this action compels the contrary conclusion. Accordingly, the Court finds that the defendants' purported right of first refusal is not a defense to the plaintiffs' infringement action.

### The "First Amendment" Defense

 The defendants' final argument is that the publication of the poster is protected by the First Amendment because it commemorated a newsworthy event. Mindful that a decision on a preliminary injunction does not conclusively determine all the issues in a case, the Court concludes that its prior decision, and the Second Circuit's affirmance of that ruling, have fully addressed and rejected the defendants' constitutional claim.

In opposing this motion for summary judgment, the defendants have raised no new factual or legal issues pertaining to their First Amendment defense. Upon reconsidering the arguments made in the first round of this litigation, the Court adheres to its initial position that "[t]here is no constitutional protection for selling posters of Elvis Presley as Elvis Presley." 444 F.Supp. at 285. This view was unequivocally affirmed by the Second Circuit which stated "that Pro Arts' poster of Presley was not privileged as celebrating a newsworthy event." 579 F.2d at 222. While the right of publicity may have to yield to the First Amendment under certain circumstances, no constitutional privilege exists on the facts of this case. *See Zacchini v. Scripps–Howard Broadcasting Co., supra*, 433 U.S. at 578–79, 97 S.Ct. at 2859.

### Cross–Motion for Vacation of Preliminary Injunction

More than two years after the issuance of a preliminary injunction, the defendants have moved to vacate that order on the grounds that (1) the Court abused its discretion by failing to order a full evidentiary hearing prior to granting the plaintiffs' preliminary injunction motion; (2) the Court erred in ordering that the deposition of Colonel Tom Parker, taken in connection with a different action, be incorporated in the record; and (3) the injunction is overly broad and conflicts with federal copyright law. For the reasons given briefly below, the Court rejects each of these arguments.

The plaintiffs point out that the defendants raised their first two contentions before the Second Circuit and should thus be foreclosed from relitigating these points. Even apart from the question of preclusion, the Court concludes that the motion has not been made "within a reasonable time" as required by Federal Rule of Civil Procedure ("Rule") 60(b). Finally, the defendants' arguments are without merit.

A trial court has broad discretion in determining whether to hold a full evidentiary hearing on a preliminary injunction motion. *See Redac Project 6426, Inc. v. Allstate Insurance Co.*, 402 F.2d 789, 790 (2d Cir. 1968). In the case at bar, the defendants were granted additional time to submit affidavits and memoranda after the Court issued a temporary restraining order against them in a companion action. *See* Transcript of October 5, 1977 Hearing at 8, 10, 11. While the defendants filed additional papers concerning procedural issues, no further discovery was conducted and no attempt was made to controvert the facts pertinent to the merits of the preliminary injunction motion. Thus, on appeal, the Second Circuit stated that "the facts are not in dispute." 579 F.2d at 216. In short, an evidentiary hearing was not required and the injunction cannot be challenged on that ground.

The defendants contend that the inclusion of Colonel Parker's deposition in the record on appeal was prejudicial and violated Federal Rule of Evidence 804. The defendants, however, have failed to establish how they were prejudiced by this testimony. While it is true that the defendants were not directly represented at the deposition, the Court rejects their assertion that the testimony was never made available to them. To reiterate, the Second Circuit found that the facts were undisputed and defendants had ample opportunity to press this claim before the court of appeals. Finally, even if Colonel Parker's testimony constituted hearsay evidence, Rule 65(a) permits the use of evidence that would not be admissible at a trial on the merits in determining a motion for a preliminary injunction. *See SEC v. General Refractories Co.*, 400 F.Supp. 1248, 1255 (D.D.C.1975).

The defendants' final objection is that the preliminary injunction is invalid under the 1976 Act. The injunction prohibits the sale of posters or reproductions containing any picture or likeness of Elvis Presley and the use of Presley's name or image for commercial profit. The terms of the order thus include not just the "In Memory" poster but any subsequent items that the defendants may seek to distribute. The defendants contend that the plaintiffs' right of publicity is preempted pursuant to section 301 of the 1976 Act. Therefore, they argue, the injunction cannot restrain the distribution of items prepared and marketed after January 1, 1978, the effective date of the 1976 Act. This argument, however, has already been answered by the Court's ruling that the right of publicity is not preempted by the 1976 Act. Accordingly, the injunction may prohibit distribution of articles even after the effective date of that Act and. is neither overly broad nor contrary to federal law.

## Conclusion

The Court has reaffirmed its initial ruling that the plaintiffs possess a valid and transferable right of publicity that survived Elvis Presley's death. This right is neither contrary to nor preempted by federal copyright law. The defendants were not authorized to publish and sell the "IN MEMORY" poster pursuant to any alleged right of first refusal. Finally, distribution of the poster is not protected by the First Amendment.

The defendants' motion to vacate the preliminary injunction is denied. The plaintiffs' request for a permanent injunction embodying the terms of the preliminary injunction is granted. The defendants are thus permanently enjoined from (1) manufacturing, selling, or distributing any and all posters, reproductions, or copies identical or similar to the "IN MEMORY" poster; (2) manufacturing, selling, or distributing any other posters, reproductions, or copies containing any image, picture, or likeness of Elvis Presley; and (3) utilizing for commercial profit in any manner or form the name, image, photograph, or likeness of Elvis Presley other than pursuant to an agreement approved by the plaintiffs. The plaintiffs' damages demand is also granted to the extent they seek an amount equal to the profits received by the defendants from the unauthorized sale of the "IN MEMORY" poster. This matter is hereby referred to Magistrate Naomi R. Buchwald to con-

duct hearings on the amount of money to which the plaintiffs are entitled and to submit a recommendation to the Court.

So ordered.