**M. L. BYERS, INC., Individually and as agent for Dancers, Plaintiff,**

v.

**HRG PRODUCTIONS, INC., Robert Sunderland and Marilyn Bates, jointly and severally, Defendants.**

No. 78 Civ. 6177.

United States District Court, S. D. New York.

June 13, 1980.

Fischer & Klein, New York City, for plaintiff; Norman I. Klein, New York City, of counsel.

Harley Lewin, New York City, for defendants.

### MEMORANDUM AND ORDER

KNAPP, District Judge.

We have reviewed Magistrate Nina Gershon's report and recommendation of May

---

8, 1980, as well as the transcript of the hearing held before the Magistrate on November 16, 1979. We hereby approve said report, confirm its conclusions, follow its recommendation, and incorporate the entire report (annexed hereto as Exhibit A) into this memorandum, making it a part hereof. In brief, we deny the pending motion made by defendant HRG Productions, Inc. and Robert Sunderland to dismiss the complaint for lack of personal jurisdiction.

In accordance with the view we expressed at a hearing before us on May 4, 1979, we also deny without prejudice to a subsequent renewal on an adequate showing defendants' motion pursuant to 28 U.S.C. § 1404(a) to transfer the action to the United States District Court for the Southern District of Texas, Houston Division.

SO ORDERED.

## EXHIBIT A

### REPORT AND RECOMMENDATION

#### May 8, 1980.

NINA GERSHON, United States Magistrate.

This breach of contract action was referred to me by the Honorable Whitman Knapp, District Judge, to hear and report on three questions:

(1) whether defendant Sunderland came to New York on one or two occasions for negotiations on the contract at issue;

(2) whether an agreement was reached in New York as to the substance of the contract; and,

(3) whether defendants' New York activities were sufficient to meet the jurisdictional requirements of C.P.L.R. § 302.

The action arises out of an agreement negotiated between plaintiff, a New York resident; defendant HRG Productions, Inc. ("HRG"), a Texas corporation; defendant Robert Sunderland, vice-president of HRG; and defendant Marilyn Bates, executive producer for HRG when the agreement was made. Plaintiff is the agent for Dennis Wayne's Dancers ("Dancers"), a New York not-for-profit corporation conducting business as a contemporary ballet company. The corporate defendant HRG and one individual defendant, Robert Sunderland, have moved to dismiss the complaint on the grounds, *inter alia*, that there is no personal jurisdiction over them.

Since this is a diversity action, the Court must look to the law of New York State to determine whether there is personal jurisdiction. *Arrowsmith v. United Press International*, 320 F.2d 219, 223 (2d Cir. 1963). The issue in this case is whether defendants have transacted business within the meaning of N.Y.C.P.L.R. § 302(a)(1). Upon review of the papers submitted by the parties and the evidence taken at a hearing on this issue, it is my conclusion that "transacting business" jurisdiction exists.

### FACTS

At the hearing the following witnesses testified: Defendant Sunderland, plaintiff Byers and Dennis Wayne, founder of Dancers. Based upon the testimony and documentary evidence at the hearing, I find the following facts.

After a meeting in Texas between Dennis Wayne and defendant Bates, a letter was sent by Wayne to HRG, dated April 24, 1978, outlining the availability of Dancers for a tour and Dancers' financial needs if such a tour were to be undertaken. Defendants Sunderland and Bates visited New York on June 13–15, 1978. Sunderland had never been in New York before except for a stopover while he was in the Air Force. He testified that he "was a complete novice in the theatrical production business" and wanted an opportunity to see the East Coast center of the theatrical production business and meet people involved in the business.

On June 14, 1978, Sunderland and Bates met with Byers and personally presented to Byers a copy of a detailed and serious tour proposal dated June 12, 1978. Sunderland considered the June 12th proposal a firm offer and testified that he came to New

York because he was "in earnest about a deal".

The parties disagree as to what was discussed during the June 14th meeting, after defendants' proposal was put forward. Byers testified that they discussed how the "guarantee against percentage of box office" figure was determined, what the potential box office would be, ticket prices at various halls and cities, and an advance of $10,000. Sunderland testified that very little occurred at the meeting and that plaintiff indicated that the proposal would have to be discussed with Dennis Wayne.

Based upon the testimony and the surrounding circumstances, I find that the parties discussed the June 12th proposal on June 14th. The June 14th meeting was the first time Byers had met with Sunderland and Bates in person. At that time Sunderland hand-delivered a copy of the proposed tour, which entailed a possible 16 performances over a three week period. I find it hard to believe that the parties did not take the opportunity for a personal meeting to engage in discussions as to some terms of the proposal.

Later, on June 14th, defendants Sunderland and Bates attended a rehearsal performance of Dancers. The purpose of the rehearsal is in dispute. Byers and Dennis Wayne testified that the rehearsal was specifically for the benefit of defendants to show them a repertoire of ballets that would be suited for a Texas tour. Sunderland testified that he did not know that the rehearsal was prepared specifically for him and that he was told prior to leaving Texas that he was likely to be in New York on the same date as the performance. I find that, while plaintiff may have intended the rehearsal be specifically for defendants' benefit, defendants were not aware of this. However, defendants knew, before coming to New York, that they were going to have the opportunity to view a premiere rehearsal of Dancers on their visit.

After the rehearsal performance, defendants spoke briefly with Dennis Wayne. Sunderland testified that there were no "substantive business discussions" during this meeting. Dennis Wayne testified that they discussed certain artistic aspects of the ballet and the type of publicity that should be used to promote the tour.[1]

A final agreement was not reached in New York. Both Byers and Sunderland understood that Dennis Wayne had to be consulted by Byers before any final agreement could be reached. And the June 18, 1978 letter sent by plaintiff to defendants, following defendants' return to Texas,[2] does not reflect that an agreement was reached in New York. Rather, it indicates that defendants' proposal could be agreed upon with one or two additions.

On June 22, 1978 plaintiff sent defendants a letter enclosing a contract.[3] The final contract was mailed back to plaintiff, signed by Bates, sometime at the end of July. Sunderland testified that negotiations went on between the parties prior to the execution of the final contract and that changes were made. Byers testified that the June 12th offer by defendants was essentially the same as the final contract and that the negotiations after that offer was made concerned mostly promotional matters. The testimony and the documents reveal the following differences between the offer of June 12, 1978 and the final contract:

(1) The payment schedule was changed to reflect a $10,000 advance against the first payment but the total guarantee of $75,000 remains the same.

(2) The itinerary was changed to reflect a change in facilities in one town and the addition of another town.

(3) The burden of paying shipping costs for publicity material was shifted from defendants to plaintiff.

1. During their visit to New York, Sunderland and Bates also attended a show at the Playboy Club at the invitation of another party.

2. Plaintiff no longer claims that defendants came to New York on more than one occasion.

3. The Court was not furnished with a copy of the contract plaintiff sent to defendants.

(4) The number of complimentary tickets issued changed.

Except for the above changes, the contract which was finally agreed upon and which is the subject of this suit contains the same terms as were contained in defendants' June 12th offer.

## DISCUSSION

■ Far fewer contacts with New York are needed to satisfy the "transacting business" test of N.Y.C.P.L.R. § 302(a)(1) than are necessary to satisfy the "doing business" test of N.Y.C.P.L.R. § 301. However, where a plaintiff relies on Section 302(a)(1), jurisdiction extends only to matters arising out of the business transacted. *See, e. g., Fontanetta v. American Board of Internal Medicine,* 421 F.2d 355 (2d Cir. 1970). As stated by the Court in *ECC Corporation v. Slater Electric, Inc.,* 336 F.Supp. 148, 152 (E.D.N.Y.1971), with respect to Section 302(a)(1) jurisdiction:

"[I]f the corporate intention is through personnel of executive substance to come to the state to effect a purposeful and important activity on the corporation's part, and by doing so such personnel significantly advance the making of a corporate contract of importance, that activity and presence suffice as a basis for a later exercise of personal jurisdiction by the State of New York over the foreign corporation with respect to matters that can genuinely be said to arise out of the resultant contract . . . ."

In the case at bar there is no question but that the claim arises out of the transaction which plaintiff asserts as its basis for jurisdiction. Therefore, the only issue is whether defendants' activities within the State with regard to the transaction (*i. e.,* the contract) are sufficient.

In *George Reiner and Co., Inc. v. Schwartz,* 41 N.Y.2d 648, 394 N.Y.S.2d 844, 363 N.E.2d 551 (1977), the Court of Appeals undertook a comprehensive historical analysis and restatement of the "transacting business" test. It upheld jurisdiction where the defendant came to New York for one day in response to plaintiff's ad in a Boston newspaper, reached an agreement to represent plaintiff as a salesman in an area not including New York, and then returned to New England to work. The Court concluded (at 653, 394 N.Y.S.2d at 847, 363 N.E.2d at 554): "There can be no question that, by his acts, defendant has purposefully availed himself of the privilege of conducting activities in our jurisdiction, thus invoking the benefits and protection of our laws (*Hanson v. Denckla,* [357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958)])."

The Court in *Reiner* discussed with apparent approval its earlier decision in *Longines-Wittnauer Watch Co. v. Barnes & Reinecke,* 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965), where it had "relied upon the quantity and composite quality of the various related activities, choosing not to rely upon the quality of any particular one". 41 N.Y.2d at 651, 394 N.Y.S.2d at 846, 363 N.E.2d at 553. Again with apparent approval, the Court described *Hi Fashion Wigs v. Hammond Adv.,* 32 N.Y.2d 583, 347 N.Y.S.2d 47, 300 N.E.2d 421 (1973), where it had upheld jurisdiction over a third-party defendant who had travelled to New York from Oklahoma to deliver his personal guarantee on a contract. As noted in *Reiner* (at 652–653, 394 N.Y.S.2d at 847, 363 N.E.2d at 554): "The Court [in *Hi Fashion Wigs*] found the delivery of the guarantee to be essential to the existence of the contract"; and the Court had further "acknowledged that the same result could have been reached absent a New York contract, by 'looking at the transaction as a whole' . . . . ."[4]

■ The facts in the case at bar establish "transacting business" jurisdiction. Defendant Sunderland was a "complete novice in the theatrical production business", who came to New York for the specific purpose

---

4. The Court took the opportunity to comment on some of the federal court decisions in this area. It specifically disapproved, as not consonant with its own decisions, the decision in *Aurea Jewelry Creations, Inc. v. Lissona,* 344 F.Supp. 179 (S.D.N.Y.1972), cited by defendants. *Reiner, supra,* 41 N.Y.2d at 654, 394 N.Y.S.2d 844, 363 N.E.2d 551.

of furthering the contract that was being negotiated. He was, as he testified, "in earnest about a deal". Sunderland, HRG's vice-president, and another high-ranking official of HRG, hand-carried HRG's offer to New York. Although an agreement was not reached in New York, that offer, with some changes that defendants do not dispute were relatively minor, became the basis of the contract at issue in this case. After personally presenting the offer to plaintiff in New York, negotiations took place here. These negotiations included discussion of an advance of $10,000, which later became a term of the final contract.

Also, while in New York the two officials of HRG were presented with a viewing of a premiere rehearsal performance of the dance group that was the subject of the contract. Following that rehearsal defendant Sunderland had the opportunity to meet for the first time the founder of Dancers and to discuss with him some aspects of the ballet and proposed tour.

Evaluation of defendants' combined activities in New York clearly shows that the three day trip here was essential to the existence of the contract. Therefore, I conclude that defendants have "purposefully availed" themselves "of the privilege of conducting activities" in New York, thus invoking the benefits and protection of New York's laws. *Reiner, supra,* 41 N.Y.2d at 653, 394 N.Y.S.2d at 847, 363 N.E.2d at 554, citing *Hanson v. Denckla,* 357 U.S. at 253, 78 S.Ct. at 1239.

In a case similar to that at bar, even fewer contacts than those present here were found sufficient to support jurisdiction. In *Stark v. Spitz,* 38 A.D.2d 966, 331 N.Y.S.2d 709 (2d Dept. 1972), the Court found that defendant had transacted business within the meaning of Section 302(a)(1) where, through an agent, it had solicited plaintiffs and delivered relevant documents to plaintiffs in New York. Here, while there is a question as to which party initially solicited the other, there was far more than mere delivery of relevant documents to plaintiff in New York. Two high-ranking officers of HRG travelled from Texas to New York and hand-delivered their offer to plaintiff at plaintiff's New York offices where they then discussed and negotiated that offer. And it was in New York that HRG's officers were able to view the premiere rehearsal performance of the ballet that HRG was offering to promote. Thus, here there was the corporate intention "through personnel of executive substance to come to the state to effect purposeful and important activity on the corporation's part, and by doing so such personnel significantly advance[d] the making of a corporate contract of importance . . . ." *ECC Corporation, supra,* 336 F.Supp. at 152.

Defendants rely on *Galgay v. Bulletin Company, Inc.,* 504 F.2d 1062 (2d Cir. 1974), where the Court found a lack of *in personam* jurisdiction over the defendant. In *Galgay* a New York plaintiff and a non-resident defendant entered into negotiations in Pennsylvania for the sale of machinery. The Court found that mere execution of the contract by plaintiff in New York was not enough to find that the defendant had transacted business in the state within the meaning of C.P.L.R. § 302(a)(1) and noted that "As far as purposeful activity is concerned, it is much more meaningful" that plaintiff's representatives went to Philadelphia to negotiate the contract. 504 F.2d at 1065. The Court also found that the requirement that a party acting on defendant's behalf transport the machinery from New York to Pennsylvania, f. o. b. New York, with the risk of loss on the defendant while the goods were being shipped, did not give rise to "transacting business" jurisdiction. 504 F.2d at 1064–1066. Here, unlike in *Galgay,* two high-ranking officers of HRG came to New York to present a specific, detailed and firm offer and they negotiated terms of the contract here. In addition, they previewed in New York the premiere public rehearsal of the dance group they were contracting to produce. Thus, unlike the situation in *Galgay,* the defendants' activities in New York were purposeful activities which significantly advanced the making of the contract at issue.

## CONCLUSION

As discussed above, I have reached the following conclusions on the issues referred to me:

(1) Defendant Sunderland came to New York on one occasion for negotiations on the contract;

(2) No agreement on the contract was reached in New York;

(3) Defendants' various New York activities were sufficient to meet the jurisdictional requirements of N.Y.C.P.L.R. § 302.

Accordingly, the motion to dismiss for want of personal jurisdiction should be denied.