**Sandra MAYER, Plaintiff,**

v.

**JOSIAH WEDGWOOD & SONS, LTD., Defendant.**

**No. 84 Civ. 1222 (PKL).**

United States District Court, S.D. New York.

Feb. 7, 1985.

Lisa Kolb Liebert, New York City, for plaintiff.

Leonard S. Sandweiss, New York City, for defendant.

## OPINION AND ORDER

LEISURE, District Judge:

This case concerns a dispute over a Christmas tree ornament. Rather than fostering peace and harmony in the holiday spirit, the ornament has instead led to litigation.

The ornament consists of a small round cameo made of blue jasperware (dull gloss china), embossed with a white snowflake in bas relief, and mounted in gold. It is surrounded by three alternating perpendicular concentric gold bands, with a small eye hook at the top, presumably for hanging. This ornament was offered for sale in the United States during the 1982 Christmas season by Josiah Wedgwood & Sons, Inc.

This suit centers on plaintiff Sandra Mayer's charge that the snowflake design found on the ornament is a substantial copy of a design she had submitted to the Wedgwood organization some years earlier with a view to marketing a Christmas plate featuring the design. Her plan was ultimately rejected. In the instant suit she claims she is entitled to be paid for her design, which she asserts was the model for Wedgwood's snowflake.

Mayer's complaint was filed in February 1984. The defendant, Josiah Wedgwood & Sons, Ltd. ("JWS Ltd."), is a British corporation with its principal place of business in England. It manufactures the famous Wedgwood brand china. It is a wholly owned subsidiary of Wedgwood plc ("plc"), which likewise is a British corporation headquartered in England. Josiah Wedgwood & Sons, Inc. ("JWS Inc."), is a New York corporation with its principal place of business in either New York or New Jersey. It, too, is a wholly owned subsidiary of plc. It purchases JWS Ltd.'s product and imports it into the United States, where it resells the china out of its own inventory. It is on JWS Inc. that Mayer originally had process served, on the theory that it is JWS Ltd.'s agent or alter ego in New York. She later effected service of process by mail upon JWS Ltd. in England.

This case is now before me on defendant's motion for summary judgment. For the reasons set forth below, that motion should be granted.

## I. FACTS.

The plaintiff, Sandra Mayer, is an artist. Her work, including snowflake designs, has been sold to museums and art houses. Her snowflake designs are a product of her own "interpretation" of what is found in nature. According to Mayer, her work on snowflakes began with a trip to the library —"probably" the Great Neck library— where she looked at books about snow, photocopied certain pages of designs, and "worked from there." She does not remember which books she used, and she destroyed the photocopies when she was done with them. No federally registered copyright was obtained for any of her work, though she did place a copyright notice on at least some of her creations. The design at issue here, however, had no such copyright notice.

In late 1978 or early 1979, Mayer met with Roy Moyer, a representative of the United Nations Children's Fund (UNICEF),

and offered to contribute this design to UNICEF for use in a Christmas card to be issued by UNICEF. UNICEF accepted her offer and for the 1979 holiday season marketed a greeting card featuring Mayer's snowflake, which was embossed on the cover. The back of the card acknowledged Mayer's contribution, but contained no copyright notice.[1]

At about the same time, Mayer began exploring possibilities for commercial exploitation of her snowflake. She engaged the services of one Emil ("Sam") Polk, president of a company called Latama, Inc. It was proposed that a Christmas plate be manufactured, featuring Mayer's design. In an effort to bring the plan to fruition, Polk approached James Fulks, Vice President-Marketing of JWS Inc., to explore possibilities for a deal. Negotiations began, and in December 1978, Mayer submitted to JWS Inc. through Polk an embossed print of the snowflake design.

The Wedgwood organization ordinarily designs, produces and distributes its own products. Occasionally, though, it is approached by outsiders with specific ideas for china products. These are "custom orders." When JWS Inc. receives a proposal for a custom order, it contacts JWS Ltd., which manufactures all of Wedgwood's china, to inform it of the proposal. JWS Ltd. then determines whether production would be feasible, what the necessary costs are, what the minimum quantity should be, and other such matters. JWS Inc. informs the customer of JWS Ltd.'s decision. If the custom order goes ahead, JWS Ltd. manufactures the items and sells them to JWS Inc., which then resells them to the customer.

The Polk proposal was one such custom order. Polk's dealings were wholly with JWS Inc., and the negotiations were evidenced by correspondence between JWS Inc. and Polk and between JWS Ltd. and JWS Inc. Polk never dealt directly with JWS Ltd. The documents indicate that a limited run of 10,000 plates was contemplated, which would be marketed through a new company organized by Polk called Art International. Much of the correspondence concerned the contents of the backstamp on the proposed plates and the design and size of the plate's border. It is clear from the correspondence between the two Wedgwood companies that by October 25, 1979, the Polk project was considered unfeasible and thus would not be going forward.

At this point the evidence presented to me becomes unclear. Mayer testified at deposition that she does not remember requesting return of her print (deposition p. 87). However, in a letter dated July 27, 1983, Catherine Adamczyk, Corporate Secretary of JWS Inc., wrote to Mayer's attorney, Ms. Liebert, that the print had been returned to Polk in 1979. I have no evidence from Polk or anyone else as to where the print is now.

According to the complaint, Mayer discovered "her" snowflake on Wedgwood's ornament on or about November 1, 1982. In 1983, Mayer through Liebert contacted Adamczyk at JWS Inc. to discuss her claim that her design had been used without payment. Adamczyk promised to do some research to determine the source of the design on the Christmas ornament and to get back to Liebert. On November 23, 1983, Adamczyk wrote to Liebert to inform her that the snowflake on the ornament had been created in Wedgwood's Design Studio, adding that Wedgwood had no need to copy snowflake designs from others and had not in fact done so.[2]

---

1. The legend on the back of the card reads: "Snow Crystals. By Sondra [sic] Mayer, United States of America. Design contributed to benefit the United Nations Children's Fund (UNICEF)." The legend also appears in French, Spanish, Russian and Chinese.

2. Adamczyk's letter reads in relevant part as follows.

Surely, the snowflake motif is most common on Christmas items done in any medium and since it is a scientific fact that no two snowflakes are exactly alike, it is extremely unlikely that our own artists would need to duplicate someone else's idea to create a snowflake design.

Also, Ms. Meyer [sic] never designed for us directly, but for Sam Polk in regard to this particular project. Since the sketches were returned to Sam Polk in 1979, it is completely erroneous to suggest that they were used for a

On February 22, 1984, Mayer filed suit against JWS Ltd. Her complaint states two causes of action. The first alleges that JWS Ltd. converted her design to its own use, and the second alleges unfair competition. She seeks damages for the alleged conversion and an accounting and payment to her of all profits earned by JWS Ltd. on sales of the allegedly infringing Christmas ornament. Subject matter jurisdiction is founded on diversity of citizenship under 28 U.S.C. § 1332.[3] Process was served on JWS Inc.

On July 13, 1984, after conducting some discovery of plaintiff, defendant filed this motion for summary judgment. JWS Ltd.'s motion raises four objections to Mayer's suit: lack of personal jurisdiction; insufficient service of process; preemption of Mayer's claim by federal copyright law; and failure to join Polk and UNICEF as indispensable parties.

Mayer conducted some discovery, and at about the same time she filed her response to JWS Ltd.'s motion, she effected service by mail upon JWS Ltd. in order to obviate any possible insufficiency of service attributable to the fact that process had been served not on JWS Ltd. but on JWS Inc.

I have received briefs and heard oral argument of defendant's motion. I conclude that defendant's motion should be granted and this case dismissed.

## II. IN PERSONAM JURISDICTION.

Since subject matter jurisdiction in this case is founded on diversity of citizenship under 28 U.S.C. § 1332, the issue of this Court's personal jurisdiction over JWS Ltd. is determined by the law of the state in which this Court sits, in this case New York. *See Arrowsmith v. United Press Int'l*, 320 F.2d 219 (2d Cir.1963) (Friendly, J.). The burden of establishing the court's jurisdiction "rests upon the party asserting it." *Trafalgar Capital Corp. v. Oil Producers Equip. Corp.*, 555 F.Supp. 305, 308 (S.D.N.Y.1983) (citation

omitted). *Accord Lehigh Valley Indus., Inc. v. Birenbaum*, 527 F.2d 87, 92 (2d Cir.1975); *Bialek v. Racal-Milgo, Inc.*, 545 F.Supp. 25, 31 (S.D.N.Y.1982). Thus, Mayer "must show by the complaint and supporting affidavits the essential requirements of the jurisdictional statute." *Lehigh Valley*, supra at 92 (citations omitted).[4]

Additional facts relevant to the jurisdictional question are as follows. Wedgwood's operations in England are divided among a number of apparently autonomous wholly owned subsidiaries of plc, and its American operation involves a number of different locations. JWS Ltd. manufactures the china products. Products meant for export from England are then sold to Josiah Wedgwood & Sons (Exports) Ltd. ("Exports"), which then resells the America-bound china to JWS Inc. on terms F.O.B. factory. Exports does the shipping. The products sold to JWS Inc. are off-loaded in New Jersey and brought to JWS Inc.'s warehouse, which is also in New Jersey. Occasionally there is an emergency order which must be brought into the U.S. quickly. In such cases, JWS Inc. has the order flown in to Kennedy Airport in New York.

JWS Inc.'s warehouse and the bulk of its employees and offices are located in New Jersey. In its New York facility are its top executive officers, marketing and public relations executives, and a showroom.

JWS Ltd.'s activities in New York are extremely limited. JWS Ltd. does not itself advertise its products in the United States. All American promotion of Wedgwood products is done by JWS Inc. JWS Ltd. does, however, supply certain brochures to JWS Inc. for "public relations and informational purposes." (Interrog. ans. 40). These brochures deal with such topics as the history of Wedgwood and how Wedgwood products are made.

Several JWS Ltd. employees travel to New York during the year for various purposes. (Interrog. ans. 38). Most of these

---

project that wasn't even in the idea stage until 1982.

**3.** Mayer is a New York citizen and JWS Ltd. is a foreign corporation.

**4.** Of course, for purposes of this summary judgment motion I must construe all papers in a light favorable to the plaintiff, the nonmoving party.

visits appear to be related to market research; the employees "sound the market," discuss new products and designs, and familiarize themselves with the American market's requirements. Occasionally, a craft potter will come for demonstration purposes or a sales director will come for a public relations presentation. Other JWS Ltd. executives travel to New York to discuss "special projects" handled by JWS Inc.; others come as liaison to the "New York Office" or to discuss inventory control.

Several hundred containers of Wedgwood products are shipped into the United States each year. The cameos used in the ornament at issue followed the usual shipment route from England to New Jersey. They were mounted in the gold setting and packaged as ornaments in Connecticut. The finished ornaments were then distributed from JWS Inc.'s New Jersey warehouse. At least some of the ornaments appeared in JWS Inc.'s New York showroom.

Plc's predecessor corporation, Josiah Wedgwood & Sons, Ltd., qualified to do business in New York in 1915, but it stopped doing business in New York in 1919, when JWS Inc. was organized. The parent became Wedgwood Ltd. in 1966 and plc in 1981. JWS Ltd. was formed in England in 1966.

In 1980, plc's New York counsel found through a routine search that plc's predecessor had never been removed from the list of companies licensed to do business in New York. He immediately contacted the appropriate state agencies to file a certificate of withdrawal. After numerous inquiries and letters, he was informed by the New York State Department of Taxation and Finance on September 4, 1981 that no withdrawal need be filed since neither plc nor its predecessor was registered to do business in New York.

 Mayer has advanced three theories in support of her contention that JWS Ltd. is subject to this Court's jurisdiction. She argues that JWS Ltd. is doing business in New York within the meaning of CPLR § 301; that JWS Ltd. has transacted business in New York under CPLR § 302(a)(1); and that it has committed a tort outside the state causing injury within the state under CPLR § 302(a)(3). Section 302(a)(1) alone suffices to establish JWS Ltd.'s amenability to suit in New York in this case.[5]

**5.** While it is not necessary in light of this holding to decide whether JWS Ltd. is subject to suit in New York under §§ 301 and 302(a)(3), a brief discussion of those sections is warranted, since counsel has addressed in depth the issues they raise.

Two possible theories could be advanced by Mayer in favor of holding JWS Ltd. amenable to suit in New York under § 301. One is that JWS Inc. is a mere department of plc, as is JWS Ltd., so that JWS Inc. would be JWS Ltd.'s alter-ego. Mayer does not seriously contend that this theory applies here. A subsidiary will be considered a "mere department" for § 301 purposes only if the foreign parent's control of the subsidiary is pervasive enough that the corporate separation is more formal than real, *see Taca Int'l Airlines, S.A. v. Rolls-Royce of England, Ltd.,* 15 N.Y.2d 97, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1965). In making that evaluation courts look to factors beyond mere stock ownership, such as the subsidiary's financial dependency on the parent, the parent's interference in assignment of top executive personnel of the subsidiary, failure to observe corporate formalities, and control by the parent of the subsidiary's day-to-day operations. *See Volkswagenwerk A.G. v. Beech Aircraft Corp.,* 751 F.2d 117 at 120–122 (2d Cir.

1984). No evidence of such control has been presented to me; JWS Inc. appears to be autonomous.

The other possibility is an agency theory. JWS Ltd. would be subject to suit in New York under § 301 if JWS Inc. was doing business here in its behalf. While an entity other than a corporate affiliate may be considered an agent for § 301 purposes, *see, e.g., Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116 (2d Cir.1967), *cert. denied,* 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968), corporate affiliation may, in light of the facts of a given case, give rise to a "valid inference" of agency. *See Delagi v. Volkswagenwerk A.G.,* 29 N.Y.2d 426, 431, 328 N.Y.S.2d 653, 656, 278 N.E.2d 895, 896 (1972). No such inference arises here. JWS Inc.'s relationship to JWS Ltd. seems no different from that of any major distributor to its manufacturer. Its advertising, promotion and servicing are done on its own behalf to further its own corporate purposes. Once it purchases the china from England, all responsibility for it is JWS Inc.'s alone. It bears all risks and burdens of inventory, credit and customer complaints. It has no power to bind JWS Ltd. to anything. Thus, the common ownership of JWS Inc. and JWS Ltd. is a mere fortuity, at least as far as § 301 is concerned. It does not, in view of the structure of

Section 302(a)(1) permits a New York court to assert jurisdiction over a nondomiciliary who transacts business in New York[6] personally or through an agent. Such jurisdiction is limited to causes of action arising from the jurisdictional predicate. I find that JWS Ltd. transacted business in New York by negotiating with Polk through its agent, JWS Inc., and that this lawsuit arises out of those negotiations.

■ The agency provision of § 302 has not been strictly construed. A formal agency relationship is not necessary for jurisdiction. Instead, a more flexible concept of agency is used.[7] " '[A]gent' ... include[s] any person who, with the consent of the nondomiciliary and under some measure of his control, acts in New York for the benefit of the nondomiciliary." *Mayes v. Leipziger*, 674 F.2d 178, 181 (2d Cir.1982). *See also* McLaughlin, Practice Commentaries on § 302, C302:3, N.Y.Civ. Prac.L. at 52 (McKinney Supp.1984-85).

In this case, JWS Inc. acted as an intermediary between JWS Ltd. and Polk in the negotiations over the proposed Christmas plate. JWS Ltd. determined what was feasible and JWS Inc. informed Polk on JWS Ltd.'s behalf of JWS Ltd.'s position. A potentially profitable proposition had been presented to JWS Ltd. in New York, and JWS Ltd. explored its possibilities, using JWS Inc. as its mouthpiece and relay station in New York. Thus, the negotiations between Polk and JWS Ltd. took place in New York, with JWS Inc. acting as JWS Ltd.'s agent.[8]

■ Moreover, significant contract negotiations in New York constitute transaction of business here for jurisdictional purposes,[9] and it makes no difference

the relationship between the two companies, give rise to a valid inference of agency. *See Baird v. Day & Zimmerman*, 390 F.Supp. 883 (S.D.N.Y.1974), *aff'd mem. sub nom. Baird v. Harvey Aluminum Co., Inc.*, 510 F.2d 968 (2d Cir.1975).

Under § 302(a)(3), a defendant is subject to jurisdiction if it has committed "a tortious act outside the state causing injury to person or property within the state," and certain other conditions are met. In this case, Mayer has not shown injury in New York. Under § 302(a)(3), the claimed injury must be assigned a situs for jurisdictional purposes. The injury is not deemed to have occurred in New York merely because plaintiff is domiciled here. *Dogan v. Harbert Constr. Corp.*, 507 F.Supp. 254, 262 (S.D. N.Y.1980); *McGowan v. Smith*, 52 N.Y.2d 268, 274-75, 437 N.Y.S.2d 643, 646, 419 N.E.2d 321, 324 (1981) (injury not deemed to occur in New York merely because plaintiff resides here and some suffering occurred here); *Fantis Foods, Inc. v. Standard Importing Co.*, 49 N.Y.2d 317, 326, 425 N.Y.S.2d 783, 787, 402 N.E.2d 122, 126 (1980). Rather, the place of injury is where "the critical events associated with the dispute took place." *Chemical Bank v. World Hockey Ass'n*, 403 F.Supp. 1374, 1380 (S.D.N.Y.1975). This usually means that the acts causing the injury must have occurred in New York, *Chemical Bank, supra* at 1380 (conversion), or that there was a significant loss of New York business, *see American Eutectic Welding Alloys Sales Co., Inc. v. Dytron Alloys Corp.*, 439 F.2d 428, 432-35 (2d Cir.1971); *Sybron Corp. v. Wetzel*, 46 N.Y.2d 197, 205, 413 N.Y.S.2d 127, 131, 385 N.E.2d 1055, 1058 (1978).

Whether the "critical events" in this case occurred in England or in New York is a question that has been wholly unaddressed. According-

ly, jurisdiction in this case could not be bottomed on § 302(a)(3).

6. The second clause of § 302(a)(1), regarding nondomiciliaries who contract to ship goods into New York, is inapplicable here. The cameos at issue in this case were shipped to New Jersey, according to the companies' standard practice.

7. *See Louis Marx & Co. v. Fuji Seiko Co., Ltd.*, 453 F.Supp. 385, 390 (S.D.N.Y.1978); *Merkel Assocs., Inc. v. Bellofram Corp.*, 437 F.Supp. 612, 617 n. 2 (W.D.N.Y.1977).

8. JWS Inc.'s role as a "relay station" for JWS Ltd. calls to mind *Parke-Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970). There the New York Court of Appeals held that a person in New York who informed a person in California by telephone of the progress of an auction in New York and relayed his bids to the auctioneer was the Californian's agent for purposes of § 302. Similarly, here JWS Ltd. wished to avail itself of a business opportunity presented in New York, and to that end negotiated with Polk through JWS Inc., its jurisdictional agent.

9. It is beyond cavil that jurisdiction may be based on § 302(a)(1) in tort actions as well as contract actions, so long as the cause of action arises out of the defendant's transaction of business in New York. *Longines-Wittnauer Watch Co., Inc. v. Barnes & Reinecke, Inc.*, 15 N.Y.2d 443, 466, 261 N.Y.S.2d 8, 26, 209 N.E.2d 68, 81 (1965), *cert. denied sub nom. Estwing Mfg. Co. v. Singer*, 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965), and sources cited therein.

"whether the negotiations are preliminary, or whether the contract is executed in New York, or whether performance is contemplated for New York." *Bastille Properties, Inc. v. Hometels of Am., Inc.*, 476 F.Supp. 175, 177 (S.D.N.Y.1979). Preliminary negotiations in New York that are "essential to the existence of the contract" provide sufficient contact to establish New York's personal jurisdiction over the non-domiciliary defendant. *M.L. Byers, Inc. v. HRG Productions, Inc.*, 492 F.Supp. 827, 831 (S.D.N.Y.1980). There is no logical reason for holding finalization of the New York-negotiated contract crucial to jurisdiction under § 302(a)(1). Where, as here, defendant's agent acted in New York to "further ... the contract that was being negotiated," *id.*, defendant has "purposefully availed himself" of the "privilege of conducting activities" in this state and accordingly is subject to suit in its courts. *Id.* (citing *George Reiner & Co. v. Schwartz*, 41 N.Y.2d 648, 653, 394 N.Y.S.2d 844, 847, 363 N.E.2d 551, 554 (1977)). The fact that the negotiations bore no fruit does not alter the nature and quality of JWS Ltd.'s actions here through JWS Inc. Therefore, I find that JWS Ltd. did transact business in New York, through its agent, JWS Inc.

■ Finally, I find that this dispute does arise from that transaction of business. It was pursuant to the Polk-JWS Inc. negotiations that Mayer's print was given to JWS Inc. and transmitted to JWS Ltd. Thus, it was the negotiations in New York that put Mayer's print into JWS Ltd.'s hands, providing the opportunity for JWS Ltd. to perform the alleged act which is the subject of this suit. Hence, the "articulable nexus between the business transacted and the cause of action sued upon" (*McGowan*, supra, 52 N.Y.2d at 272, 437 N.Y.S.2d at 645, 419 N.E.2d at 323) necessary to the maintenance of an action in New York under § 302(a)(1) is present in this case.

JWS Ltd. is subject to this suit in New York.

## III. PREEMPTION.

When Congress revised the copyright laws in 1976, it specifically provided for preemption of all state rights equivalent to those within the scope of federal copyright law. 17 U.S.C. § 301.[10] Under § 301, federal preemption takes hold once three conditions are met: the work is the type of work protected by the copyright laws; the right asserted is equivalent to a right protected by federal copyright law; and the January 1, 1978 cutoff date is met. When these three conditions converge, the state law right of action is preempted.

### A. *The time element.*

■ The preemption provision of § 301 by its terms does not apply to state law rights and remedies as to "any cause of action arising from undertakings commenced before January 1, 1978."[11] It is quite clear from the language and back-

---

**10.** 17 U.S.C. § 301 provides in relevant part as follows.

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any state.

(b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to—

(1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103, including works of authorship not fixed in any tangible medium of expression; or

(2) any cause of action arising from undertakings commenced before January 1, 1978; or

(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.

**11.** 17 U.S.C. § 301(b)(2).

ground of § 301(a) that Congress meant to exclude from preemption only those cases in which the cause of action arose before January 1, 1978. Section 301(a) provides that federal law governs all rights in covered works, "whether created before or after [January 1, 1978]." Thus, the deadline applies to the cause of action, not to the work of authorship. The legislative history of the copyright law revision of 1976 reinforces this conclusion.[12] Thus, although the statute is susceptible to a reading which would exclude from preemption causes of action in which the work in issue was created before 1976, by reading "undertaking" to refer to the works of authorship,[13] such a reading is clearly erroneous in light of the congressional intent.[14]

 In this case, the work from which the dispute arose was created before January 1, 1978. The causes of action, though, arose later. Plaintiff's papers place the time in December 1978 when Mayer gave her print to Polk for submission to Wedgwood. Hence, any infringement of her rights necessarily occurred later, and in any event after January 1, 1978. Thus,

Mayer's cause of action is within the temporal scope of § 301 preemption.

**B.** *Subject matter of copyright.*

A state law action covering "subject matter that does not come within the subject matter of copyright as defined by sections 102 and 103 ..." is not preempted by § 301. 17 U.S.C. § 301(b)(1). In general terms, that subject matter is "original works of authorship fixed in any tangible medium of expression," 17 U.S.C. § 102(a), including "compilations and derivative works," 17 U.S.C. § 103(a). Section 102(a) lists several examples of protectible works, among which is "pictorial, graphic and sculptural works." 17 U.S.C. § 102(a)(5).

 Mayer's snowflake design clearly is within the subject matter of the copyright laws. Indeed, Mayer's attorney had at one time considered adding to the complaint a copyright claim (Mayer Dep. at 94–95), but later abandoned the idea, apparently because no such claim could be stated due to the design's entry into the public domain with its publication in the UNICEF card.[15] Thus, the second condition of preemption under § 301 is met in this case.[16]

---

**12.** According to the House Report, "subsection (b) list[s] three general areas left unaffected by the preemption ... [one of these is] causes of action arising under State law before the effective date of the statute ...." Copyright Law Revision, H.R.Rep. No. 1476, 94th Cong., 2d Sess. 132 (1976) [hereinafter "House Report"], *reprinted at* 1976 U.S.Code Cong. & Ad.News 5659, 5747.

**13.** *See, e.g., Orth-O-Vision, Inc. v. Home Box Office,* 474 F.Supp. 672 (S.D.N.Y.1979).

**14.** *See also* 1 M. Nimmer, *The Law of Copyright* § 1.01[B][3] at 1–27 n. 116 (1984).

**15.** The fact that a work has entered the public domain does not itself remove causes of action respecting that work from the scope of § 301's preemptive provisions. As the House Report states, if

a work fits within one of the general subject matter categories of sections 102 and 103, the bill prevents the States from protecting it even if it fails to qualify for federal statutory copyright because ... it has fallen into the public domain.

House Report at 131, U.S.Code Cong. & Admin. News 1976, p. 5747.

**16.** Federal copyright law does not protect ideas, 17 U.S.C. § 102(b). Rather, it protects only the author's particular expression of those ideas. *See Mazer v. Stein,* 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954); *Reyher v. Children's Television Workshop,* 533 F.2d 87, 90 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976). Thus, state laws that protect ideas, as distinct from their expression, are without the subject matter of copyright and therefore not preempted under § 301.

In this case, Mayer is seeking to protect her right to use her snowflake design from appropriation by JWS Ltd. She does not—indeed, realistically no one can—claim rights in the *idea* of using snowflake designs on Christmas items. Thus, her reliance on *Werlin v. Reader's Digest Ass'n, Inc.,* 528 F.Supp. 451 (S.D.N.Y.1981) for the proposition that § 301 does not preempt misappropriation and quasi-contract claims is misplaced. In *Werlin,* Judge Ward held simply that Reader's Digest was liable for using plaintiff's story idea, though it did not use plaintiff's story, and that the actions for Reader's Digest use of plaintiff's *idea* were not preempted. Here, by contrast, Mayer is complaining of use by JWS Ltd. of her design itself, not the idea of using a snowflake design for Christmas items.

C. *Nature of the right.*

Section 301, while preempting state law as to rights equivalent to copyright, specifically preserved nonequivalent state law rights. 17 U.S.C. § 301(b)(3). Thus, the issue to be determined here is whether actions for conversion and the misappropriation branch of unfair competition protect rights that are "equivalent" to those protected by federal copyright law. Because Congress did not define equivalence in the statute, I turn now to the legislative history and case law development of § 301.

1. *Legislative History.* Section 301 as enacted describes the preempted rights generically, that is, as those rights "equivalent" to copyright. Earlier drafts of § 301, however, contained examples of the types of actions that § 301 did not aim to preempt. At the time it was submitted to the House, § 301(b)(3) preserved state law actions pertaining to

> activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106, including rights against *misappropriation* not equivalent to any of such exclusive rights, breaches of contract, breaches of trust, trespass, *conversion,* invasion of privacy, defamation, and deceptive trade practices such as passing off and false representation.

House Report at 24 (emphasis added). Thus, both causes of action Mayer is suing upon were mentioned among those excluded from § 301 preemption. Moreover, it seems that no inference as to Congress's intent may be drawn from the fact that the illustrative list was dropped from the stat-

ute as it finally was enacted. In a detailed discussion of this point, Nimmer points out that "[i]t seems clear that the amendment which caused such deletion was not intended substantively to alter Section 301(b)(3) as regards those examples." 1 M. Nimmer, *The Law of Copyright* § 1.01[B][3] at 1–14.3 (1984) (footnote omitted). Thus, it may appear that conversion and misappropriation claims have not been preempted.

In this case, however, the prior draft is of no aid to plaintiff. It is quite clear from the House Report that "conversion" in the draft refers to a cause of action to vindicate possessory rights in chattels.[17] Plaintiff here obviously means something else. Her conversion claim alleges that JWS Ltd. converted her snowflake design by reproducing it on the Christmas ornament, causing her damage of at least $100,000. It is not reasonable to think that the print itself was worth such a large amount of money. Indeed, Mayer testified that besides her investment of perhaps 15 hours of her time, she incurred a total of approximately $125 in out-of-pocket expenses to create the design at issue in this case. (Mayer Dep. pp. 81–83). Thus, Mayer is not suing to vindicate her right to the physical print which was given to defendant. It is plain that what Mayer is suing for is the deprivation of the rights flowing from the labor and expertise which she embodied in the snowflake.[18]

The misappropriation claims preserved by the statute are only those "not equivalent to any such exclusive rights." The draft language thus is circular. It is apparent, though, that Congress recognized that, in at least some instances, misappro-

---

**17.** Nothing contained in section 301 precludes the owner of a *material embodiment* of a copy ... from enforcing a claim of conversion against one who takes possession of the copy ... without consent.
House Report at 133.

**18.** It is at least open to question whether New York law permits an action for conversion where the property assertedly converted is not a specific tangible item of personal property. There is no dearth of New York authority limiting the tort to interferences with possessory rights in chattels. *See Harper & Row, Publish-*

*ers, Inc. v. Nation Enters.,* 501 F.Supp. 848, 852 n. 10 (S.D.N.Y.1980), *aff'd,* 723 F.2d 195 (2d Cir.1983), *cert. granted,* — U.S. —, 104 S.Ct. 2655, 81 L.Ed.2d 362 (1984), and sources cited therein. On the other hand, there is authority that permits maintenance of a conversion suit where the property right taken "includes the incorporeal right to the exclusive use of its contents." *Taft v. Smith, Gray & Co.,* 76 Misc. 283, 286, 134 N.Y.S. 1011 (Sup.Ct.1912). I am assuming for purposes of this motion that Mayer is relying on the latter concept of conversion and, without so deciding, that it represents the law of New York.

priation claims would be preempted. Noting that " 'misappropriation' is not *necessarily* synonymous with copyright infringement," House Report at 132, U.S.Code Cong. & Admin.News 1976, p. 5748 (emphasis added), the House Report used as an example of an unpreempted misappropriation action—*International News Serv. v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918) ("*INS*"). In *INS*, defendant was found to have taken the facts reported in plaintiff's transmissions of "hot news" and used them in its own competing news service. The other example advanced was of sanctions imposed on one who improperly invades another's computerized data base and gains access to the data. Both these examples involve subject matter other than copyright, specifically the facts and data as opposed to their expression. Thus, the House Report states that "a cause of action labelled as 'misappropriation' is not preempted if it is in fact based neither on a right within the general scope of copyright ... nor on a right equivalent thereto." House Report at 132, U.S.Code Cong. & Admin.News 1976, p. 5748. It is thus not surprising that the House Report considered misappropriation to survive preemption. The tort it had in mind was not equivalent to copyright infringement.

■■ The misappropriation branch of unfair competition under New York law, however, is arguably a somewhat different tort,[19] one that the House Report did not directly consider. Although it traces its roots to *INS*, the New York misappropriation tort has grown much broader. It is now a fact-oriented action, providing relief from all types of "commercial immorality," *Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 101 N.Y.S.2d 483 (Sup.Ct.1950), *aff'd*, 279 A.D. 632, 107 N.Y.S.2d 795 (1951). Generally, it protects against a defendant's competing

use of a valuable product or idea created by the plaintiff through investment of time, effort, money and expertise. *See, e.g., Standard & Poor's Corp. v. Commodity Exch., Inc.*, 683 F.2d 704, 710–11 (2d Cir. 1982).[20]

Thus, the legislative history of § 301 gives no direct guidance as to the contours of preemption in this case. Accordingly, I turn now to the cases dealing with the scope of § 301's preemptive effect in this case.

■■ *2. Case law.* Section 301 has been applied by various courts to preempt a wide range of actions. *See, e.g., Harper & Row, Publishers, Inc. v. Nation Enters.*, 501 F.Supp. 848 (S.D.N.Y.1980) (conversion and tortious interference with contractual relations), *aff'd*, 723 F.2d 195 (2d Cir.1983), *cert. granted*, —— U.S. ——, 104 S.Ct. 2655, 81 L.Ed.2d 362 (1984); *Warner Bros. v. American Bdcstg. Cos., Inc.*, 720 F.2d 231 (2d Cir.1983) (unfair competition/misappropriation); *Crow v. Wainwright*, 720 F.2d 1224 (11th Cir.1983) (crime of dealing in stolen property); *Mention v. Gessell*, 714 F.2d 87 (9th Cir.1983) (common law copyright and misappropriation); *Smith v. Weinstein*, 578 F.Supp. 1297, 1307 (S.D.N. Y.1984) ("plaintiff cannot merely rephrase the same claim citing contract law....") *aff'd mem.* 738 F.2d 419 (2d Cir.1984); *Editorial Photocolor Archives, Inc. v. Granger Collection*, 61 N.Y.2d 517, 474 N.Y. S.2d 964, 463 N.E.2d 365 (1984) (misappropriation). It is important, however, to focus on the facts of each case and the particular rights the plaintiff seeks to protect. Courts have found that state law torts similar to those found in the cases above to be preempted, often even sharing the same names, in fact survive § 301. *See, e.g., Oddo v. Ries*, 743 F.2d 630, 636 (9th Cir.

---

**19.** See Nimmer, *supra* note 14 at 1–20–21.

**20.** On the New York law of misappropriation, *see, e.g., Roy Export Co. v. Columbia Bdcstg. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); *Flexitized, Inc. v. National Flexitized Corp.*, 335 F.2d 774 (2d Cir.1964) *cert. denied*, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799

(1965); *Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.2d 556, 567–68, 190 N.Y.S.2d 977, 986–87, 161 N.E.2d 197, 203–04 (1959); *Ronson Art Metal Works, Inc. v. Gibson Lighter Mfg. Co.*, 3 A.D.2d 227, 230–31, 159 N.Y.S.2d 606, 609–10 (1957); *Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 101 N.Y. S.2d 483 (Sup.Ct.1950), *aff'd* 279 A.D. 632, 107 N.Y.S.2d 795 (1951).

1984) (conversion and breach of fiduciary duty); *United States Trotting Ass'n v. Chicago Downs Ass'n,* 665 F.2d 781, 785 n. 6 (7th Cir.1981) (conversion); *Factors Etc., Inc. v. Pro-Arts, Inc.,* 496 F.Supp. 1090 (S.D.N.Y.1980) (treating § 301 as codification of *Sears-Compco* doctrine which governed pre-1978 actions, court held right of publicity not preempted under prior law) *rev'd on other grounds,* 652 F.2d 278 (2d Cir.1981), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1982); *DC Comics, Inc. v. Filmation Assocs.,* 486 F.Supp. 1273 (S.D.N.Y.1980) (unfair competition/misappropriation). The test for preemption was well-stated by Nimmer in his classic treatise.

> [A] right which is "equivalent to copyright" is one which is infringed by the mere act of reproduction, performance, distribution or display.... If under state law the act of reproduction, performance, distribution or display, ... will *in itself* infringe the state created right, then such right is preempted. But if other elements are required, in addition to or instead of, the acts of reproduction, performance, distribution or display, in order to constitute a state created cause of action, then the right does not lie "within the general scope of copyright," and there is no preemption.

Nimmer, *supra* at 1–11–12. *Accord Oddo v. Ries,* 743 F.2d at 635; *Harper & Row,* 723 F.2d at 200. The prevailing test may be referred to as the "extra element" test. That extra element, however, must be one which changes the nature of the action so that it is *qualitatively* different from a copyright infringement claim. Elements such as awareness or intent, which alter the action's scope but not its nature, will not save it from preemption under § 301. *See Harper & Row,* 501 F.Supp. at 853; *Crow,* 720 F.2d at 1226. Thus, the issue here is whether Mayer's conversion and misappropriation claims contain an "extra element" which qualitatively distinguishes the actions and their underlying rights from those addressed by copyright law.

■ The conversion claim fails on its own terms. Count I of the complaint alleges that Mayer "possessed the right to use, sell, assign or reproduce [the] design" (Complaint ¶ 12) and that JWS Ltd. "wrongfully converted plaintiff's snowflake design to its own use and benefit by reproducing said design on a 1982 Wedgwood Christmas ornament" (Complaint ¶ 13). Thus, the rights asserted are clearly the same as those protected by § 106 of the copyright law, and the act constituting the alleged violation of plaintiff's rights corresponds exactly to the act necessary for a copyright infringement. I have not been shown, nor am I aware of any, extra element of the conversion claim that would save it. Thus, even assuming that plaintiff may assert a claim for conversion of an intangible property right under New York law, *see supra* note 18, that claim is preempted here.

■ As for misappropriation, Mayer asserts that there is in fact an extra element that will save the action from preemption—commercial immorality. But it is hard to see how this is an extra element. In this case, the alleged misappropriation of Mayer's time, talent and effort is by the reproduction of the product of her time, talent and effort, i.e. the snowflake design (Complaint ¶¶ 16–18). That is precisely the type of misconduct the copyright laws are designed to guard against. To call such conduct immoral adds nothing. "Commercial immorality" appears to be merely a judgmental label attached to odious business conduct, not an extra element.

If, however, it is an extra element, it is not the type that would save the action from preemption. It is an extra element in the same sense that awareness and intent are: it alters the *scope* of the action but not its nature. That is, it would permit the action to go forward when the infringing conduct is immoral, but not when it is not immoral. The basic act which constitutes the infringement of plaintiff's rights, however, is the same as that of copyright. The claimed use rights are identical as well. Thus, the cause of action asserted here is not qualitatively different from one for

copyright infringement, and accordingly it is preempted.[21]

Plaintiff relies on *Roy Export Co. v. Columbia Bdcstg. Sys., Inc.*, 672 F.2d 1095 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982) to support her contention that § 301 does not preempt misappropriation actions. That reliance is misplaced, since *Roy Export* was decided under pre-1978 law. In *Roy Export*, the allegedly misappropriated work was unpublished. This meant that under pre-1978 law the work received state law protection. Section 2 of the old copyright act specifically provided that state laws protecting unpublished works were preserved from preemption.[22] It was because of this section of the former law that the Second Circuit held the misappropriation action not preempted. *Roy Export*, 672 F.2d at 1096. That has no bearing, however, on the instant case, which is governed by the new copyright laws.

## IV. REMAINING CONTENTIONS.

Mayer's memorandum of law suggested that besides the conversion and misappropriation claims, the facts of this case would support a breach of confidentiality claim as well as a claim for unjust enrichment. This is significant because these claims are possibly not equivalent to a copyright claim, would thus not be preempted, and would lead to possible denial of this summary judgment motion.

■■■■■ In this case, the fact that Mayer permitted her design to enter the public domain is fatal to any claim she can assert. Any theory of liability she could advance would necessarily assume she holds some property interest in the snowflake design. Yet it is elementary that once copyrightable material is published without the author's first securing federal copyright protection, the author loses his property interest in the material. The material becomes public property. *See Decorative Aides Corp. v. Staple Sewing Aides Corp.*, 497 F.Supp. 154, 161 (S.D.N.Y.1980), *aff'd mem.*, 657 F.2d 262 (2d Cir.1981). *See also Shaw v. Williamsville Manor, Inc.*, 38 A.D.2d 442, 330 N.Y.S.2d 623 (1972). In this case, Mayer no longer owned her design. The public did. So if JWS Ltd. was unjustly enriched, it was not at her expense.[23] Thus, although plaintiff's donation of her design to UNICEF certainly is laudatory, her failure to first take the necessary precautions has proved to be her undoing.

■■■■ Furthermore, the breach of confidentiality claim necessarily would fail as well. The design had been published in the UNICEF card. Even if the design had been copyrighted, the publication removed from the design the secrecy that a breach of confidentiality action requires. *See Lemelson v. Kellogg Co.*, 440 F.2d 986, 987 (2d Cir.1971); *Ferber v. Sterndent Corp.*, 73 A.D.2d 590, 422 N.Y.S.2d 131 (1979), *aff'd* 51 N.Y.2d 782, 433 N.Y.S.2d 85, 412 N.E.2d 1311 (1980). The publication of the design removed it from the realm of the secret and confidential. There can be no action for breach of a confidentiality that does not exist.

## V. CONCLUSION.

Defendant JWS Ltd. is subject to the jurisdiction of this court in this case under

---

**21.** *See* Nimmer, *supra* at 1–20–21.

Mayer's claim would have been preempted even under the pre-1978 law, since ·the snowflake design had been published in the UNICEF card, and had thereby entered the public domain. *Cf. H.W. Wilson Co. v. National Library Serv. Co.*, 402 F.Supp. 456 (S.D.N.Y.1975). Publication removed it from the ambit of state law protection. *See infra* note 22 and accompanying text.

**22.** Former 17 U.S.C. § 2 provided as follows:

Nothing in this title shall be construed to annul or limit the right of the author or pro-

prietor of an unpublished work, at common law or in equity, to prevent the copying, publication, or use of such unpublished work without his consent, and to obtain damages therefor.

**23.** Mayer has argued that the design's entry into the public domain does not extinguish her rights in it, citing *Samuel Winston, Inc. v. Charles James Servs., Inc.*, 159 N.Y.S.2d 716 (Sup.Ct. 1956). *Winston*, however, was a conceded departure from settled law, and has not been followed in any other case. I decline to treat it as authoritative.

CPLR § 302. Its motion for summary judgment is granted, however, since the claims against it are preempted by the copyright laws, 17 U.S.C. § 301.

SO ORDERED.