**FROST BELT INTERNATIONAL RECORDING ENTERPRISES, INC., d/b/a Tuff City Records, Plaintiff,**

v.

**COLD CHILLIN' RECORDS, "John Doe" and "Richard Doe," Defendants.**

**No. 89 Civ. 8327 (SWK).**

United States District Court, S.D. New York.

Nov. 8, 1990.

Shatzkin & Reiss, New York City by Karen Shatzkin, for plaintiff.

Vladeck, Waldman, Elias & Engelhard, P.C., New York City by Joseph J. Garcia, for Cold Chillin' Records.

MEMORANDUM OPINION
AND ORDER

KRAM, District Judge.

Plaintiff brought this copyright infringement action to recover monetary damages

arising from defendant's alleged wrongful use of the song "A Girl Named Kim" on a recent album produced by defendant Cold Chillin' Records ("Cold Chillin' "). Defendants failed timely to interpose an answer and plaintiff moved for entry of a default judgment, which judgment was filed on February 8, 1990. Cold Chillin' now moves, pursuant to Rules 55(c) and 60(b) of the Federal Rules of Civil Procedure, for an order setting aside the default judgment.

## BACKGROUND

On March 15, 1983, plaintiff Frost Belt International Recording Enterprises, Inc. d/b/a Tuff City Records ("Tuff City") entered into a written contract with Curtis Fisher ("Fisher"), a "rap" musician, which provides generally for Fisher to render his services as a recording artist exclusively to Tuff City (the "Contract").[1] Pursuant to the Contract, Fisher recorded a number of rap compositions, including the one that is the subject of this litigation, "A Girl Named Kim."[2] On March 23, 1985, Street Tuff Tunes and Curtis Fisher, as Publisher, entered into a separate agreement with Curtis Fisher, which expressly conveys to Street Tuff Tunes the "title, words and music, and all copyrights thereof" to all compositions written by Fisher and recorded pursuant to the Contract (the "Standard Songwriters Contract").[3]

1. The Contract provides in relevant part:
    2.01 (*DIRECT DEAL WITH ARTIST*)
    During the term of this agreement you will render your services as a performing artist for purpose of making Master Recordings for Tuff City, and you will Deliver the Recordings to Tuff City, as provided in this agreement....
    3.01 During each Contract Period you will provide exclusive Artist's services to Tuff City....
    13.02 During the term of this agreement, you will not enter into any agreement which would interfere with the full and prompt performance of your obligations hereunder, and you will not perform or render any services, as a performing artist, a producer, or otherwise, for the purpose of making Master Recordings or Phonograph Records for any person except Tuff City....
    Contract ¶¶ 2.01, 3.01, 13.02.

On September 7, 1989, Aaron Fuchs ("Fuchs"), Tuff City's president, "heard Marcel Hall, a rap artist professionally known as 'Biz Markie,' perform Mr. Fisher's musical composition live on the radio station WBLS." Fuchs Aff. at ¶ 17. Knowing that Biz Markie was signed to Cold Chillin', Fuchs immediately telephoned Leonard Fitchelberg ("Fitchelberg"), Cold Chillin's president, and informed him of Tuff City's rights in "A Thing Named Kim," the name attributed to Fisher's composition "A Girl Named Kim" as performed by Biz Markie. Fuchs Aff. at ¶ 18. Fitchelberg stated that Biz Markie had already recorded the song, under the title "A Thing Named Kim," for a soon to be released album, and that it was too late to pull the song from the album. Fuchs Aff. at ¶ 19. "At the same time, Mr. Fitchelberg did not dispute that the composition was written by Mr. Fisher, who was under exclusive contract with Tuff City. He said from the outset that he just wanted to work out a monetary settlement." *Id.*

On September 11, 1989, Tuff City filed a certificate of copyright registration for "A Girl Named Kim" with the United States Copyright Office (the "Registration Certificate"). Tuff City's response to Registration Certificate question 2(a) indicates the work is not one "made for hire," and Tuff City's response to Certificate question 4 indicates that Tuff City obtained ownership

2. The record establishes that Mr. Fisher recorded "A Girl Named Kim" in December 1985 at City Music Recording Studio in Flushing, New York, and that Tuff City scheduled the recording session and paid all attendant recording costs. Affidavit of Aaron Fuchs, sworn to on June 6, 1990, at ¶ 9, and Exhibits "E" and "F" ("Fuchs Aff.").

3. Paragraph 1 of the Standard Songwriters Contract provides, in relevant part:
    The Writer(s) hereby sells, assigns, transfers and delivers to the Publisher, its successors and assigns, a certain heretofore unpublished original musical composition, written and/or composed by [Fisher]. [sic] All compositions written and recorded by [Fisher] pursuant to [the Contract] and amended thereafter including the title, words and music, and all copyrights thereof, including but not limited to the copyright registration thereof....
    Contract.

of the copyright to "A Girl Named Kim" "by written agreement." Fuchs Aff. Exhibit "B".

On October 18, 1989, at a meeting at which Tuff City General Counsel, Daniel Nooger ("Nooger"), and Fuchs had with Fitchelberg at Cold Chillin's office, Fitchelberg stated that Cold Chillin's attorney was Alan Skiena, Esq. ("Skiena"), who would draw up a written settlement agreement for their review. Fuchs Aff. at ¶ 22. Based on Fitchelberg's representation that Skiena was Cold Chillin's attorney, plaintiff sent by facsimile transmission two letters, dated October 27 and November 2, 1989, respectively, concerning plaintiff's failure to receive a draft settlement agreement. Fuchs Aff. at ¶ 23, Exhibit "G". On November 14, 1989, Skiena contacted Nooger and advised that he was not Cold Chillin's attorney but had been Biz Markie's attorney, and was now being replaced by Roderick Plummer, Esq. ("Plummer"). Fuchs Aff. at ¶ 24.

By certified letter dated November 14, 1989, Fuchs wrote, at Fitchelberg's request, to Bert Padell of the accounting firm of Padell, Nadell, Fine, Weinberger & Co., concerning resolution of the dispute and advised that "[i]f this matter is not resolved by September 21 [sic], we will take legal action to have a restraining order issued to stop the manufacture, distribution and sale of the infringing recording." Fuchs Aff. Exhibit "H". Mr. Padell responded by indicating, in a telephone conversation with Nooger, that "he was Biz's accountant only, and not Cold Chillin's." Fuchs Aff. at ¶ 26.

By certified letter dated November 17, 1989, Fuchs wrote directly to Fitchelberg. Fuchs Aff. Exhibit "H". The closing paragraph of this letter reiterates the possibility of imminent litigation and provides: "[i]f we do not receive a written ratification of our [settlement] agreement by November 21, we will take legal action to have a restraining order issued to stop the manufacture, distribution and sale of the infringing recording." Fuchs Aff. Exhibit "H".

On November 20, 1989, Nooger spoke with Plummer, who advised that as of November 17, 1989, he was Biz Markie's attorney. Affidavit of Daniel Nooger, sworn to on June 6, 1989, at ¶ 7 ("Nooger Aff."). On November 29, 1989, Nooger again spoke with Plummer and advised Plummer that Tuff City would commence suit against Cold Chillin' if the dispute was not promptly resolved.

Having failed to resolve the dispute, Tuff City commenced this action on December 15, 1989, and on that date caused a copy of the summons and complaint to be personally served upon Cold Chillin'. On January 4, 1990, Cold Chillin's time to answer or move with respect to the complaint expired and no request to extend such time had been directed to plaintiff or its attorneys.

On January 26, 1990, Plummer's secretary phoned Nooger to request an "extension" though she did not state on whose behalf the extension was sought; Nooger advised Plummer's secretary that he would "get back to her" but did not. Nooger Aff. at ¶ 13. Thereafter, Plummer made no further attempt to contact Nooger. Also on January 26th, Tuff City filed for entry of a default judgment,[4] which judgment subsequently was filed with the Clerk on February 8, 1990.[5]

On February 9, 1990, Nooger received a telephone call from Robert Cinque, Esq. ("Cinque") of the firm of Cinque & Cinque, who stated that he was Cold Chillin's attorney. Cinque requested that plaintiff stipulate to vacate the default judgment. Plaintiff refused to do so. By letter dated February 15, 1990, Cold Chillin', by its attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., wrote to the Court requesting

---

**4.** Because Cold Chillin' had not appeared in the action, plaintiff was not required to serve advance written notice of its application for a default judgment. Fed.R.Civ.P. 55(b)(2).

**5.** The record is unclear as to whether Nooger filed plaintiff's motion for entry of a default judgment before or after receiving the telephone call from Plummer's secretary. For the purposes of this motion, the Court will assume that the motion was filed subsequent to Nooger's telephone conversation with Plummer's secretary.

permission to make the instant motion, which permission was granted.

Defendant Cold Chillin' contends that the default judgment against it should be vacated and argues that (a) Cold Chillin' has meritorious defenses to plaintiff's claim, (b) plaintiff will not suffer "substantial prejudice" if the default judgment is vacated and (c) Cold Chillin' is entitled to have the default judgment vacated regardless of a finding of willful failure to timely respond to the complaint. Plaintiff strenuously opposes the motion and contends that Cold Chillin's default was willful and part of an overall dilatory strategy, and that Cold Chillin's defenses are frivolous and barred by the express terms of the Contract. For the reasons set forth below, the Court finds that Cold Chillin' has failed to establish good cause for setting aside the default judgment, and its motion should be denied.

### DISCUSSION

█ In accordance with Rule 55 of the Federal Rules of Civil Procedure, the court "[f]or good cause shown ... may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b)." Fed.R.Civ.P. 55(c). Rule 60(b) provides, in relevant part:

> the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (3) fraud ... misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; ... or (6) any other reason justifying relief from the operation of the judgment....

Fed.R.Civ.P. 60(b). In determining whether to set aside a default judgment [6] a court must consider (1) whether the default was willful, (2) whether the moving party has presented a meritorious defense, and (3) whether the party who secured the default would be prejudiced by setting it aside.

*See Brock v. Unique Racquetball and Health Clubs, Inc.,* 786 F.2d 61 (2d Cir. 1986); *Marziliano v. Heckler,* 728 F.2d 151, 156 (2d Cir.1984); *Traguth v. Zuck,* 710 F.2d 90, 94 (2d Cir.1983). Notwithstanding the general rule in this Circuit that "defaults are not favored," *Meehan v. Snow,* 652 F.2d 274, 277 (2d Cir.1981), and "the strong policies favoring the resolution of genuine disputes on their merits," *see Traguth, supra,* 710 F.2d at 94, the Court declines to set aside the default judgment on the clear and convincing evidence of Cold Chillin's willful default and the absence of a meritorious defense to plaintiff's action.

### I. *Cold Chillin's Default*

█ The Court draws the inescapable conclusion that Cold Chillin's default in responding to the complaint was willful rather than the result of any neglect, excusable or otherwise. As a result of the numerous communications between the parties (and Cold Chillin's designees on certain occasions) Cold Chillin' was fully apprised of the imminent litigation against it. Plaintiff's in-hand delivery of a copy of the summons and complaint to Cold Chillin's managing agent at Cold Chillin's 1966 Broadway offices establishes not only proper service but that the service effected insured immediate delivery of the process to a Cold Chillin' management-level employee rather than a mere agent designated to accept process. Indeed, Cold Chillin' neither contests the manner of service nor argues that the process never reached a management-level official.

In fact, there is every indication that Cold Chillin' deliberately ignored the summons and complaint. Despite the parties' extensive submissions,[7] Cold Chillin' fails to submit an affidavit from a single person with personal knowledge of the circumstances of its default in responding to the complaint, and advances absolutely no ex-

---

**6.** The standard for setting aside a default judgment by motion pursuant to Rule 60(b), applicable here, is more stringent than that for relieving a party of a default under Rule 55(c). *See Meehan v. Snow,* 652 F.2d 274 (2d Cir.1981).

**7.** In addition to the parties' submissions, the Court has read and considered the various letters to the Court in determining this motion.

planation for its default.[8] Such utter failure to explain the default effectively precludes a finding of excusable neglect. *Standard Newspapers, Inc. v. King*, 375 F.2d 115 (2d Cir.1967); *Original Appalachian Artworks v. Yuil Int'l Trading Corp.*, 105 F.R.D. 113 (S.D.N.Y.1985); *Robinson v. Bantam Books, Inc.*, 49 F.R.D. 139 (S.D.N.Y.1970). Moreover, Cold Chillin's having instructed plaintiff to contact Biz Markie's attorneys (Mr. Plummer) and accountants (the Padell firm) also indicates that Cold Chillin' was attempting to shift responsibility for resolving the matter to Biz Markie both prior and subsequent to service of process. Cold Chillin's apparent stonewalling in this fashion, after admitting that "A Thing Named Kim" was written by Mr. Fisher and indicating that Cold Chillin' wanted to work out a monetary settlement, tends to confirm its dilatory strategy and the wilfulness of its default.

■ In reaching the conclusion that Cold Chillin's default was wilful, the Court need not speculate as to whether any animus toward this Court or perceived strategic advantage motivated Cold Chillin's default. In either case, Cold Chillin', having made its decision to ignore this action, will be bound to it. *Cf. Brand v. NCC Corp.*, 540 F.Supp. 562 (E.D.Pa.1982). However, in light of established precedent in this Circuit, *see Marziliano v. Heckler, supra*, the Court declines to follow the approach of the district court in *Brand*, in which the court indicated that where a party intentionally chooses to ignore a action, a default judgment should not be set aside regardless of meritorious defenses. 540 F.Supp. at 564.[9] In accordance with *Marziliano*, therefore, the Court shall consider the merit of Cold Chillin's defenses to plaintiff's claim.

## II. *Proffered Defenses*

Cold Chillin' proffers various defenses to plaintiff's copyright claim, including the following: (1) plaintiff is not the owner of the copyright to the composition in question; (2) there has been no infringement with respect to the "music" (as opposed to the lyrics, which Cold Chillin' does not dispute are identical to those of the Fisher composition, "A Girl Named Kim"); and (3) plaintiff's claims for conversion and malicious interference with business opportunities are preempted by the Copyright Act, warranting dismissal of the complaint.

### A. Copyright Ownership

■ Cold Chillin's first claimed defense is that plaintiff did not obtain a valid copyright to "A Girl Named Kim" because the Contract does not apply to that song. Cold Chillin' reasons as follows:

> The recording contract provides that plaintiff acquires ownership rights in Master Recordings and that all Master Recordings are works made for hire. In its application to the Copyright office, however, plaintiff stated that "A Girl Named Kim" *was not* a work made for hire. Because the recording "A Girl Named Kim" was not a work made for hire, it was not a Master Recording under the recording contract, and Tuff City Records did not acquire ownership rights in the song.

Defendant's Memorandum at 3 ("Def. Mem."). In light of the operative language of the Contract, Cold Chillin's argument is utterly implausible.

The Contract indeed provides that all Master Recordings are works made for hire and shall be the sole property of Tuff City. Cold Chillin's counsel, however, deliberately excises from its Memorandum

---

**8.** The affidavit of Joseph J. Garcia ("Garcia Aff."), Cold Chillin' counsel, is of limited probative value. Though it makes no effort to explain the circumstances of the default, even with respect to the few factual matters it does recite, it fails to state that the statements of fact are made upon Garcia's personal knowledge of the relevant facts and circumstances and consists mostly of inadmissible hearsay. *See* Garcia Aff. at ¶¶ 3, 4.

**9.** Such rule, however, is well-founded in logic and, especially where there is clear and convincing evidence of wilfulness, appears better to serve the interests of justice at a time when the federal courts are increasingly burdened with the consequences of the conduct of unscrupulous litigants and counsel alike.

and replaces with an ellipsis, Def. Mem. at 10, the Contract's operative language, apparently hoping that the Court and plaintiff's counsel would somehow gloss over the conspicuously absent text. Contract paragraph 7.01 provides, in its entirety:

Each Master Recording made under this agreement or during its term, from the Inception of Recording, will be considered a "work made for hire" *for Tuff City, if any such Master Recording is determined not to be a "work made for hire" it will be transferred to Tuff City by this agreement, together with all rights in it.* All Master Recordings made under this agreement or during its term, from the Inception of Recording, and all Matrices and Phonograph Records manufactured from them, together with all performances embodied on them, shall be the sole property of Tuff City, free from any claims by you or any other Person; and Tuff City shall have the exclusive right to copyright those Master Recordings in its name as the author and owner of them and to secure any and all renewals and extensions of such copyright throughout the world....[10]

Contract paragraph 12.01 goes on to provide:

You grant to Tuff City an irrevocable license, under copyright, to reproduce

each Controlled Composition on Phonograph Records and distribute them in the United States and Canada.

Contract ¶ 12.03 makes clear that plaintiff's license to reproduce each Controlled Composition is essentially exclusive. It provides, in relevant part:

If the copyright in any controlled composition is owned or controlled by anyone else, you will cause that Person to grant Tuff City the same rights described in paragraphs 12.01 and 12.02, on the same terms. If the copyright in any controlled composition is transferred, the transfer will be made subject to this agreement.

Contract at ¶ 12.03.

The Contract could be no clearer in defining Tuff City's ownership of the copyright to recordings made by Fisher as well as its exclusive license, under copyright, to reproduce Controlled Compositions.[11] The language of paragraph 7.01 expressly grants Tuff City exclusive copyright ownership of each Master Recording *whether or not* such recording is deemed a work made for hire.[12] Thus, as long as "A Girl Named Kim" is a Master Recording[13] and Controlled Composition under the Contract, and the facts indicate that "A Girl Named Kim" is both, Tuff City has the exclusive right to distribute on phonorecords "A Girl Called Kim."

---

**10.** The language of paragraph 7.01 excised by Cold Chillin' counsel is indicated by interlineation.

**11.** Controlled Compositions are defined by the Contract as "a Composition wholly or partly written, owned or controlled by you, a Producer, or any Person in which you, or a Producer has a direct or inderect [sic] interest." Contract at ¶ 14.14.

**12.** The Court, in any event, rejects Cold Chillin's contention that the Registration Certificate itself establishes that "A Girl Named Kim" was not a work made for hire on account of plaintiff's checking-off a box in section 2(a) of the Registration Certificate indicating that the work was "not made for hire." *See* Garcia Aff. at Exhibit "C". Plaintiff also indicates on the Registration Certificate that it acceded to ownership of the copyright to "A Girl Named Kim" by "written agreement," referring obviously either to the Contract as amended or to the Standard Songwriters Contract. Since it is the Contract, which

defines what is a work made for hire under the Copy right Act as between plaintiff and Mr. Fisher, the Court is hardly persuaded that Registration Certificate's preparer, Mr. Nooger, intended with two small strokes of his pen to relinquish plaintiff's copyright to the work while completing a form which was to have precisely the opposite effect. Indeed, Nooger's explanation as to why he checked that box—that he was unfamiliar with the term "made for hire" as a term of art in the record industry, having had limited experience in that field—is entirely credible and uncontradicted by Cold Chillin'.

**13.** Paragraph 14 of the Contract provides:

[Definitions] *"Master Recording"*—every recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of phonograph records.

Contract at ¶ 14.01.

Cold Chillin's argument that Fisher's belief that "A Girl Named Kim" is not a Master Recording "because it was never pressed," as expressed in a letter to Cold Chillin' counsel (Garcia Aff. Exhibit "E"), is equally unavailing. The Contract makes plain that it was unnecessary for Tuff City to actually press phonograph records of "A Girl Named Kim" in order to retain all copyrights granted to it under the Contract. Contract at ¶ 14.01.

The Court also flatly rejects the contention that Aaron Fuchs, president of Tuff City, orally "agreed" that Fisher could sell the song to Biz Markie. Garcia Aff. Exhibit "E". There is no admissible evidence supporting this allegation [14] which, in any event, is precluded by paragraph 18.02(a) of the Contract (a no oral modification/merger clause) [15] as well as the Copyright Act itself which provides, in relevant part:

A transfer of Copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing or signed by the owner of the rights conveyed or such owner's duly authorized agent.

17 U.S.C. § 204(a) (1988).

**B. Copyright Infringement**

Cold Chillin's next proffered defense is that despite an identity of lyrics between "A Girl Named Kim" and Biz Markie's "A Thing Named Kim," plaintiff is unable to establish infringement with respect to the "music" because Biz Markie is prepared to testify that the music of "A Thing Named Kim" differs from that of "A Girl Named Kim." Compounding Cold Chillin's failure to provide any evidentiary support for this claim (or explain why Biz Markie's testimony is not now before the Court in proper evidentiary form) is Fuchs' uncontradicted testimony that:

rap music consists of a highly rhythmic monologue, which is spoken by the recording artist over a drum beat that underscores the rhythm. The heart of any rap recording is the verbal message over a drum beat ... I have listened to the Biz Markie recording. Like our recording it uses a machine-created drum track. All that it adds is a three-note bass line from time to time ...

Fuchs Aff. at ¶¶ 32–34. In addition, Cold Chillin' fails to explain why, if the "music" to "A Thing Named Kim" was copyrightable material discrete from the lyrics, the cassette package for "The Biz Never Sleeps," the album containing the song "A Thing Named Kim," credits the lyrics to Biz Markie but attributes to no one authorship of the "music." Fuchs Aff. Exhibit "J". The record thus fails to support Cold Chillin's claim that the "music" of "A Thing Named Kim" is sufficiently different from that of "A Girl Named Kim" to defeat plaintiff's claim of infringement with respect to the work as a whole. *See Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 73 F.Supp. 165 (S.D.N.Y.1947); *Norden v. Oliver Ditson Co.*, 13 F.Supp. 415 (D.Mass.1936).

Cold Chillin's corollary to this argument is that plaintiff owns the copyright

---

**14.** Plaintiff's counsel argues that:

"[t]his is a case of a witness who 'doth protest too much.' If Fisher was convinced the song was not a Master Recording, why would he seek Tuff City's permission to sell it? His offering both alibis, back to back, renders each of them much less credible."

Plaintiff's Memorandum at 12. While eminently true, the Court has the additional concern that Cold Chillin' counsel submits Fisher's testimony in an unsworn letter addressed to Cold Chillin' counsel "in connection with [their] representation of Biz Markie," Garcia Aff. Exhibit "E", rather than in a sworn affidavit. Even if the Court were convinced of the credibility of Fisher's statements, which it decidedly is not, the unsworn letter is not in admissible form and of little probative value.

**15.** The record indicates that the parties to the Contract regarded the operation of this clause with some sobriety, having amended the Contract no fewer than eight times, each time by a writing signed by an officer of Tuff City. *See* Fuchs Aff. at ¶ 15, Exhibit "D". The clause provides:

This agreement contains the entire understanding of the parties relating [to] its subject matter. No change or termination of this agreement will be binding upon Tuff City unless it is made by an instrument signed by an officer of Tuff City.

Contract at ¶ 18.02.

only to the sound recording of "A Girl Named Kim" but not to the lyrics themselves. In support of this argument, Cold Chillin' relies on the doctrine, correct in itself, that the copyright to a sound recording does not necessarily extend to the "copyrighted literary, musical or dramatic work embodied in the sound recording and fixed on a phonorecord...." Def. Reply Mem. at 3 (quoting *T.B. Harms Co. v. JEM Records*, 655 F.Supp. 1575 n. 1 (D.N.J. 1987)). Here, however, the Standard Songwriters Contract between Street Tuff Tunes and Fisher, dated March 23, 1985, expressly conveys to Street Tuff Tunes, plaintiff's affiliate (Fuchs Reply Aff. Exhibit "K"), the "title, words and music, and all copyrights" to all compositions written and recorded by Fisher pursuant to the Contract. The Court therefore rejects Cold Chillin's argument that plaintiff has no copyright interest in the music and lyrics to "A Thing Called Kim".[16]

### C. Preemption Under the Copyright Act

█ Cold Chillin's next proffered defense is that the default judgment must be set aside because plaintiff's causes of action are preempted by the Copyright Act, 17 U.S.C. § 301.[17] This defense also fails. Review of the complaint establishes that although plaintiff employs the word "converted" in each of the first four claims, and the words "deliberately and maliciously interfered with plaintiff's business opportunities" in the fifth claim, Complaint at ¶¶ 18, 22, 26, 31 and 34, plaintiff nevertheless states a claim sounding in copyright. Plaintiff incorporates by reference the following allegations into each of the complaint's claims: (a) plaintiff's action is one brought pursuant to "28 U.S.C. § 1338, in

that it arises under an Act of Congress relating to copyright"; (b) "Tuff City is the sole proprietor of the United States copyright in a recording entitled 'A Girl Named Kim'; and (c) Tuff City has filed with the United States Copyright Office a request for a Certificate of Registration for 'A Girl Named Kim' ... and may commence a copyright infringement action even though a formal Certificate of Registration has not yet been issued." Complaint ¶¶ 6–8. On the basis of these (and other copyright-related allegations) of the complaint, the Court doubts neither that the gravamen of Plaintiff's claim is copyright infringement nor that plaintiff has satisfactorily pleaded an infringement claim under the Copyright Act. Whatever else the complaint may allege, it provides fair and adequate notice of plaintiff's copyright claim. *See Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Conan Properties, Inc. v. Mattel, Inc.*, 601 F.Supp. 1179 (S.D.N.Y.1984).

Plaintiff's allegation that its claim arises under the Copyright Act, together with its satisfactory allegations of copyright infringement, easily distinguishes this case from *Mayer v. Josiah Wedgewood & Sons, Ltd.*, 601 F.Supp. 1523 (S.D.N.Y.1985), in which the court found plaintiff's common law claims of conversion and unfair competition preempted under the Copyright Act, 17 U.S.C. § 301. In *Mayer*, unlike this case, plaintiff alleged no claim under the Copyright Act and relied exclusively on its common law tort claims. Plaintiff did so apparently because no copyright claim could be stated on account of plaintiff having permitted the material in which she asserted a proprietary interest to be published without first securing federal copyright protection. 601 F.Supp. at 1532, 1536

---

16. The Court also rejects Cold Chillin's argument that Fisher transferred to defendant any copyright interest he may have in the lyrics to "A Girl Named Kim". Cold Chillin' has failed to produce a writing or other memorandum evidencing the alleged transfer, and proof of the transfer is therefore barred under the Copyright Act, 17 U.S.C. § 204.

17. Section 301 provides, in relevant part:
On or after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of

copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 101 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right in any such work under the common law or statutes of any State.
17 U.S.C. § 301(a) (1988).

(citing *Decorative Aides Corp. v. Staple Sewing Aides Corp.*, 497 F.Supp. 154, 161 (S.D.N.Y.1980), *aff'd*, 657 F.2d 262 (2d Cir. 1981)).[18] The court went on to hold that plaintiff's common law claims were preempted by the copyright laws, 17 U.S.C. § 301. *Mayer*, 601 F.Supp. at 1534–37.

*Mayer*'s preemption analysis is insufficient to warrant setting aside the default judgment because in *Mayer*, plaintiff's failure to allege a copyright claim together with its apparent inability to state a valid copyright claim had it pleaded one, appear to have been the deciding factors in the court's decision to grant defendant's motion for summary judgment on preemption grounds. 601 F.Supp. at 1352–56. Application of *Mayer* to bar plaintiff's copyright claim here would be tantamount to holding that plaintiff has failed to allege a valid claim under the Copyright Act. In light of the express copyright allegations of the complaint, the Court refuses to do so. Moreover, plaintiff's consent to withdrawal of all claims other than a claim under the Copyright Act, *see* Fuchs Aff. at ¶ 2, cures any technical pleading defect in the complaint. Thus, rather than set aside the default judgment as a result of common law claims that the complaint may contain, the Court will direct that an inquest be held with respect only to those damages or other relief obtainable under the Copyright Act, 17 U.S.C. § 501 *et seq.*

### III. *Attorneys' Fees*

▪ Under the Copyright Act, the Court may in its discretion "allow the recovery of full costs by or against any party other than the United States or an officer thereof ... [and] may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505 (1988). Because the Copyright Act is intended to encourage suits to redress copyright infringement, fees are awarded to a

prevailing plaintiff as a matter of course. *Whimsicality, Inc. v. Rubie's Costume Co., Inc.*, 891 F.2d 452 (2d Cir.1989); *Roth v. Pritikin*, 787 F.2d 54 (2d Cir.1986); *Diamond v. Am–Law Publishing Corp.*, 745 F.2d 142 (2d Cir.1984). Accordingly, plaintiff is entitled to recover, upon proper proof, its attorneys' fees reasonably incurred opposing this motion.

### CONCLUSION

For the reasons set forth above, the Court finds Cold Chillin's failure to respond to the complaint willful rather than the result of any excusable neglect, and Cold Chillin's purported defenses void of merit. Cold Chillin' has failed to establish good cause for vacating the default judgment and, accordingly, its motion to set aside the default judgment is denied. The matter shall be referred to a United States Magistrate who shall conduct an inquest to determine the damages sustained by plaintiff and recoverable under the Copyright Act, as well as plaintiff's costs and reasonable attorneys' fees incurred opposing this motion, pursuant to 17 U.S.C. § 505.

SO ORDERED.

---

**18.** The court in *Mayer* was careful to note that a work merely having entered the public domain does not prevent preemption, under Section 301, of causes of action relating to that work. Quoting from the House Report, the court explained:

> [if] a work fits into one of the general subject matter categories of sections 102 and 103, the

bill prevents the States from protecting it even if it fails to qualify for federal statutory copyright because ... it has fallen into the public domain.

601 F.Supp. 1523 (S.D.N.Y.1985) (quoting H.R. No. 94–1476 94th Cong.2d Sess. 131 *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5747.)